IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

03 OCT -8 PH 1:42

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ESTATE OF KIRKMAN O'NEAL, deceased; ) | |
| ELIZABETH O'NEAL WHITE SHANNON, ) | |
| EMMET O'NEAL, and EMMET O'NEAL, III, ) | |
| Personal Representatives, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.: 94-PT-2493-S |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

ENTERED
OCT 8 2003

MEMORANDUM OPINION

This cause comes on to be heard upon cross-motions for partial summary judgment.

Defendant United States of America ("the Government") filed its motion on May 8, 2003 (Doc.

29). Plaintiffs filed their motions on May 9, 2003 (Docs. 32-34).[1]

FACTS AND PROCEDURAL HISTORY[2]

I. General Background

This case involves certain federal estate taxes on the estate of Kirkman O'Neal ("Mr.

O'Neal"), deceased. Mr. O'Neal, founder of O'Neal Steel, Inc., died in Birmingham, Alabama

on August 7, 1988. Prior to Mr. O'Neal's death, he was married to Elizabeth Paramore O'Neal

("Mrs. O'Neal"). Mr. And Mrs. O'Neal had two children: Emmet O'Neal, II, and Elizabeth P.

---

[1]Plaintiffs filed three separate motions -- one for each issue for which they seek summary judgment. The court has attempted to synthesize the various briefs filed in connection with the parties' motions. References to the briefs filed in connection with the Government's motion will be cited as "Def. Br. at __," "Pl. Response at __," etc. References to briefs filed in connection with the plaintiffs' motions will be to "Pl. First Br. at __," "Def. First Response at __," etc.

[2]The statement of facts and the summary of the parties' arguments may overlap somewhat.

94

O'Neal White Shannon ("Elizabeth Shannon").  They also had seven grandchildren: Emmet

O'Neal, III, Kirkman O'Neal, II, Henry Craft O'Neal, who are the children of Emmet O'Neal, II,

and Elizabeth White Reed, Margaret White Head, Virginia White Page, and David H. White, Jr.,

who are the children of Elizabeth Shannon. *See, e.g.,* Def. Ex. 1 at IRS Form 706.  Mr. O'Neal

was survived by his wife, his children, and his grandchildren. *See* Pl. Ex. 4 at 1, 5.

On August 10, 1988, Letters Testamentary were granted to Mrs. O'Neal, Elizabeth

Shannon, Emmet O'Neal, II, and Emmet O'Neal, III by the Probate Court of Jefferson County,

Alabama. *See* Def. Ex. 2.  After Mrs. O'Neal died on July 23, 1994, the Probate Court ordered

that the Letters Testamentary be amended and reissued to Elizabeth Shannon, Emmet O'Neal, II,

and Emmet O'Neal III. *Id.*  On or around May 3, 1989, the then representatives filed an estate

tax return for Mr. O'Neal's estate, reporting an estate tax liability of $1,632,128 and remitting

payment in the same amount. *See* Def. Ex. 1, 3.  On that tax return, Mr. O'Neal's estate chose to

use the alternate valuation date. *See* Def. Ex. 1 at IRS From 706, page 2, Part 3, line 1.

In or around July 1990, Internal Revenue Service ("IRS") examiner Suzanne Paulson was

assigned to examine Mr. O'Neal's estate tax return. *See* Def. Ex. 4.  On April 28, 1992, the IRS

issued a Statutory Notice of Estate Tax Deficiency to Mr. O'Neal's estate, proposing an estate

tax deficiency in the amount of $951,587, plus interest. *See* Def. Ex. 5.  On May 7, 1992, Mr.

O'Neal's estate contested the Statutory Notice of Estate Tax Deficiency, paid the $951,587 plus

$357,232 in interest, and filed a refund claim. *See* Def. Ex. 3, 6.  In the refund claim, Mr.

O'Neal's estate sought a refund of $2,941,487.38, plus interest and costs. *See* Def. Ex. 6.  On

October 20, 1992, the IRS issued a Notice of Disallowance, denying the refund sought by Mr.

O'Neal's estate. *See* Def. Ex. 7.  On October 14, 1994, plaintiffs filed this refund action, seeking

2

the full refund plus interest and costs.[3]

In its motion, the Government has identified four issues which it argues govern the outcome of this case: (1) Whether Mr. O'Neal's estate is entitled to claim a deduction for any alleged restitution claims that his donees might have been able to assert against his estate; (2) Whether the adjusted taxable gifts and corresponding gift tax payable amounts reported on Mr. O'Neal's estate tax return must be revalued for federal estate tax purposes; (3) Whether Mr. O'Neal's estate must be increased by $700,000 in order to reflect that Mr. O'Neal's funds were used to pay a portion of the gift taxes due on gifts made by Mrs. O'Neal in 1987; and (4) Whether the deduction for the 1988 Alabama income tax liability claimed by Mr. O'Neal's estate must be reduced to properly reflect the correct amount of Mr. O'Neal's share of such liability.[4] Plaintiffs have filed three separate motions for partial summary judgment. The First and Third Motions appear to relate to issues raised by the defendants. The Second Motion involves whether the estate can deduct unpaid gift taxes that plaintiffs argue are still due. The pertinent facts will be discussed in connection with the issue addressed.

## II. Facts Pertaining to Deductions for Certain Donees' Claims (Defendant's Issue 1 and Plaintiffs' First Motion)

Before November 3, 1987, Mr. O'Neal was a minority shareholder in O'Neal Steel, a closely held corporation that engaged in the steel service/distribution business. O'Neal Steel had two classes of common stock. The first class was Class A nonvoting common stock, of which

---

[3]From approximately October 1994 until November 2002, this action was stayed at the request of the parties, pending the resolution of related litigation involving Mrs. O'Neal. *See O'Neal v. Comm'r*, 102 T.C. 666 (1994); *Estate of Elizabeth O'Neal, et al. v. United States*, 81 F. Supp. 2d 1205 (N.D. Ala. 2000), *aff'd in part and vacated in part*, 258 F.3d 1265 (11th Cir. 2001).

[4]The Government identified a fifth issue, i.e., whether Mr. O'Neal's estate is entitled to claim a deduction for certain additional administrative expenses incurred or paid by Mr. O'Neal's estate. However, the Government seeks summary judgment only on the first four issues.

3

171,859 of the 200,000 shares were outstanding as of June 30, 1987.  The second class was Class

B voting common stock, of which 223 of the 1,500 authorized shares were outstanding as of

June 30, 1987.  As of the close of business on November 2, 1987, Mr. O'Neal owned 42,262

shares of Class A stock and 35 shares of Class B stock.

On November 3, 1987, Mr. O'Neal made gifts of Class A and Class B stock to his two

children and seven grandchildren ("the donees").[5]  *See* Def. Ex. 8; Pl. Ex. 4 at 1-4, Exs. 7-8.

Specifically, Mr. O'Neal made the following gifts to the donees:

| Donee | Gift |
| --- | --- |
| Emmet O'Neal, II | 1 share of Class A stock<br>18 shares of Class B stock |
| Elizabeth Shannon | 17 shares of Class B stock |
| Emmet O'Neal, III | 7,043 shares of Class A stock |
| Kirkman O'Neal, II | 7,043 shares of Class A stock |
| Henry Craft O'Neal | 7,043 shares of Class A stock |
| Virginia White Page | 5,283 shares of Class A stock |
| Elizabeth White Reed | 5,283 shares of Class A stock |
| Margaret White Head | 5,283 shares of Class A stock |
| David H. White, Jr. | 5,283 shares of Class A stock |

Before the gifts of stock were completed, three agreements had been entered into: (a) an

agreement dated November 3, 1987 ("Consent Agreement") in which all shareholders consented

to the transfer of the stock pursuant to a June 28, 1951 buy-sell agreement, *see* Def. Ex. 10; Pl.

---

[5]Mrs. O'Neal also owned Class A and Class B stock and made similar donations on November 3, 1987.
*See* Def. Ex. 9; Def. Br. at 7; Pl. Exs. 4, 7-8; Pl. Response at 5.

4

Ex. 9; (b) the Supplemental Stock Purchase Agreement dated November 3, 1987 which was

entered into by the grandchildren only, *see* Def. Ex. 11; and (c) the Escrow Agreement dated

November 3, 1987 which was entered into by Mr. and Mrs. O'Neal, as donors, and Emmet

O'Neal, II, as escrow agent. *See* Def. Ex. 12. Pursuant to the Escrow Agreement, Mr. and Mrs.

O'Neal, as donors, delivered to Emmet O'Neal, as escrow agent, the shares of stock for

safekeeping until all the donees signed the Consent Agreement and the Supplemental Stock

Purchase Agreement. *See* Def. Ex. 12. The Consent Agreement provided, *inter alia*, that the

stock be transferred under a buy-sell agreement (see below). *See* Def. Ex. 10. The Supplemental

Stock Purchase Agreement provided, *inter alia*, that the grandchildren donees would contribute,

on a pro rata basis, toward the payment of any transferee gift tax liability imposed upon any one

of them. *See* Def. Ex. 11 at § 7. Upon completion of the conditions for the gifts, the donees

received stock certificates conveying ownership in the numbers of shares set forth above.

Both the Class A and Class B stock certificates contained a legend on their face

indicating that they were "transferable on the books of the Company by the holder hereof in

person or by duly authorized attorney, on surrender of this certificate, properly endorsed, subject,

however, to the restrictions referred to on the reverse hereof. . . ." *See* Def. Ex. 13. The backs of

the stock certificates stated:"The shares of stock evidence by this certificate are held and may be

transferred only subject to the terms, provisions and options contained in an agreement dated

June 28, 1951, as amended, and as recorded in Section 17 of the By-Laws of the Corporation, as

amended." *Id.* The 1951 agreement was a restrictive buy-sell agreement. *See* Def. Exs. 14-15;

Pl. Ex. 9. Specifically, the buy-sell agreement restricted the transferability of the O'Neal Steel

stock during the lifetime and upon the death of the shareholder and provided a procedure by

which O'Neal family members could purchase the stock at fixed prices only. *Id.* When the gifts were made in 1987, the fixed option prices for Class A and Class B stock were $54 and $61, respectively. *See* Def. Exs. 19-20; Pl. Exs. 17-18. Plaintiffs assert that previous valuations of the stock had been computed by Management Planning, Inc. ("MPI"), but this particular valuation was computed by the directors of O'Neal Steel, not MPI. *See* Pl. Exs. 19-25.

In addition to the fixed option price restriction, the buy-sell agreement further restricted transfers of O'Neal Steel stock by limiting the shareholders who were entitled to exercise the options being offered under the agreement. Specifically, only shareholders "who were designated as shareholders that were entitled to benefit under the agreement" were allowed to exercise the option to purchase the stock of another shareholder. *See* Def. Exs. 14-15, 20. Only shareholders who are members of the O'Neal family have been granted entitlement to the rights and benefits arising under the agreement. *Id.*

On or around April 15, 1988, Mr. and Mrs. O'Neal filed separate Forms 709, the gift tax return form, with the IRS. *See* Def. Exs. 8-9; Pl. Exs. 7-8. On these returns, Mr. and Mrs. O'Neal elected to split their gifts pursuant to IRS Code § 2513. They reported the gifts of stock made to the donees, at the value at which the stock could be sold under the buy-sell agreement, i.e., $54 for Class A stock and $61 for Class B stock. Attached to the tax returns were copies of the buy-sell agreement and copies of the financial statements of O'Neal Steel. *Id.* Mr. and Mrs. O'Neal owed $820,665 and $810,186 in gift taxes, respectively. *Id.* Plaintiffs note that Mr. O'Neal's payment of his 1987 gift taxes were due on April 15, 1988, and that at 12:01 a.m. on April 16, 1988, IRS Code § 6324(b) imposed personal liability on the donees for the portion of the 1987 gift taxes that were due but not paid.

6

The Government notes that Revenue Ruling 59-60 provides some guidance on how to value closely-held stock for gift and estate tax purposes. *See* Def. Ex. 25. Specifically, special rules are provided for valuing stock subject to an agreement restricting its sale or transfer. *Id.* at § 8. The Government also notes that as of the date of Mr. O'Neal's death, no appraisal of the O'Neal Steel stock had been performed or was in existence. *See* Def. Ex. 24 at 54.[6] At the time of Mr. O'Neal's death, the IRS had not selected Mr. or Mrs. O'Neal's 1987 gift tax returns for examination. Nor had the IRS proposed to assess any gift taxes, including additions to tax or interest, with respect to the gifts made on November 3, 1987. The Government also contends that as of the date of Mr. O'Neal's death, neither Mr. O'Neal nor Mrs. O'Neal had made any efforts to amend their 1987 gift tax returns, and the donees had neither made any payments toward gift taxes nor made any claims against Mr. O'Neal seeking restitution or reimbursement of gift taxes.

As of the date of Mr. O'Neal's death, his assets totaled approximately $4.8 million, while his probate assets totaled approximately $4.0 million. *See* Def. Ex. 1 at Form 706, page 3, Part 5, Schedules A-G. *See also* Def. Br. at 16-17 (breakdown of assets). Excluding the claims made by the donees, the debts due and owing by Mr. O'Neal totaled approximately $1.1 million. *See* Def. Ex. 1 at Form 706, page 3, Part 5, Schedule K. *See also* Def. Br. at 17-18 (breakdown of debts). A bequest was also due to be paid to Mrs. O'Neal, as surviving spouse, in the amount of $11,068. *See* Def. Ex. 1 at Form 706, page 3, Part 5, Schedule M.

Plaintiffs point to additional events that occurred after Mr. O'Neal died. The IRS selected Mr. O'Neal's estate tax return for an audit. *See* Pl. Ex. 5 at 2. As part of the estate tax

---

[6]The court notes that defense exhibit 24 is a deposition transcript from one of the related cases involving Mrs. O'Neal.

audit, the IRS identified the gift tax returns as items that needed to be examined. *See* Pl. Ex. 26. The IRS also received a copy of the buy-sell agreement and other papers related to O'Neal Steel's business. *See* Pl. Ex. 5 at 2; Ex. 27. According to plaintiffs, this information was received well before April 15, 1991, which was the last day on which the IRS could assessed additional gift tax with respect to the 1987 gifts against Mr. O'Neal's estate. *See* Pl. Ex. 5 at 2-3; 26 U.S.C. § 6501(a). Plaintiffs contend that it was the IRS's position that while the buy-sell agreement could determine stock value for estate tax purposes, it could not determine the stock value for gift tax purposes. *See* Pl. Ex. 30, Exhibit A at 14, 21-25.

On September 19, 1991, the attorney auditing Mr. O'Neal's estate requested additional information concerning O'Neal Steel. *See* Pl. Ex. 31. On November 25, 1991, the IRS confirmed that it had engaged an outside appraiser to value the donees' stock. *See* Pl. Ex. 32. The next day, the estate's attorneys wrote the IRS insisting that the stock had been properly valued on the 1987 gift tax returns, questioning the timeliness of any attempt by the IRS to assess additional gift taxes, and asserting that if such liability was asserted against the donees these claims would be deductible against Mr. O'Neal's estate. *See* Pl. Ex. 33. On February 6, 1992, the outside appraiser issued a report indicating that the values of the stock were significantly higher than reported. *See* Pl. Ex. 34. As noted above, on April 13, 1992, the IRS issued a Statutory Notice of Estate Tax Deficiency to each donee. *See* Pl. Exs. 36-44. Each Notice stated that it was for "the transfer tax liability (gift tax and generation-skipping transfer tax) of Kirkman O'Neal . . . ." *Id.*[7] As will be discussed more fully below, the deficiency was eventually settled. *See* Pl. First Br. at 10-13 (discussion of history of settlement). The donees

_____

[7]Similar notices were issued with respect to Mrs. O'Neal's gift taxes. *See* Pl. Exs. 45-53.

filed claims on June 24, 1992 against the estate of Mr. O'Neal. *See* Pl. Exs. 122-130. The

representatives of Mr. O'Neal's estate eventually paid the donees for their claims against the

estate. *See* Pl. First Br. at 14-15.

### III. Facts Pertaining to Revaluation of "Adjusted Taxable Gifts" and "Gift Tax Payable" (Defendant's Issue 2)

On Mr. O'Neal's estate tax return, the estate reported that the adjusted taxable gifts

totaled $2,373,724, thus making a gift tax payable in the amount of $820,665. *See* Def. Ex. 1 at

Form 706, page 1, lines 4, 9. According to the Government, these amounts included amounts

relating to the gifts of O'Neal Steel stock made to the donees in 1987. *See* Def. Exs. 1, 8. For

purposes of computing federal estate tax, the Government also notes, the adjusted taxable gifts

and gift tax payable must be adjusted to reflect any revaluation of the gifts of O'Neal Steel stock

made in 1987. *See* Def. Ex. 4. In the Statutory Notice of Estate Tax Deficiency sent on April

28, 1992, the IRS proposed to increase: (a) the adjusted taxable gifts by an amount equal to

$12,814,717, resulting in an adjusted taxable gifts total of $15,188,411, and (b) the gift tax

payable by an amount equal to $7,040,223, making the gift tax payable total $7,860,888. *See*

Def. Exs. 4-5. The adjusted stock prices were based on the appraisal performed by the IRS.

Eventually, the IRS and the donees settled the transferee liability issue. *See* Def. Exs. 28-30.

The settlement provided that the value of the Class A stock would be increased from $54 to $77

per share, and that the value of the Class B stock would be increased from $61 to $82 per share.

*Id.* The Government contends that the gifts must be revalued for estate tax purposes, although

the amount of revaluation would depend on whether the estate is allowed a deduction for the

donees' purported claims. *See* Def. Br. at 20, ¶¶ 59-60.

### IV. Facts Pertaining to the Inclusion of Funds Used to Pay Mrs. O'Neal's Gift Taxes

**(Defendant's Issue 3 and Plaintiffs' Third Motion)**

In November 1987, Mr. and Mrs. O'Neal gave all of their O'Neal Steel stock to their children and grandchildren. Because of these gifts, Mr. and Mrs. O'Neal filed gift tax returns for the year 1987. *See* Def. Exs. 8-9. As noted above, on those returns the O'Neals elected gift splitting pursuant to IRS Code § 2513. Also as noted above, Mr. O'Neal reported gift taxes due in the amount of $820,665, while Mrs. O'Neal reported gift taxes due in the amount of $810,186. *Id.*

Prior to these gifts, in December 1986, the shareholders of O'Neal Steel elected "S Corporation" status for O'Neal Steel effective with the tax year beginning July 1, 1987. *See* Def. Exs. 31-32. Anticipating that this change would require O'Neal Steel to change its tax year to a calendar year, and that such a change would require the allocation of significant income to Mr. and Mrs. O'Neal on their 1987 income tax return, Mr. O'Neal made a payment of $1,437,000 to the IRS to cover estimated income tax. *See* Def. Exs. 32-34. According to the Government, this payment was made from Mr. O'Neal's separate funds. However, plaintiffs note that roughly 46% of the $1,437,000 was directly attributable to income earned by Mrs. O'Neal. *See* Pl. Third Br. at 3. Accordingly, plaintiffs contend, $664,543 of the estimated tax payment was being paid to satisfy Mrs. O'Neal's portion of the 1987 income tax liability. *Id.*

After the payment was made, legislation was enacted that allowed O'Neal Steel to retain the same tax year it had always used. *See* Def. Ex. 35. The estimated income tax payment thus became an overestimate. The IRS contends that it was directed to apply the payment to the outstanding gift taxes owed by Mr. and Mrs. O'Neal. Plaintiffs counter that Mr. and Mrs. O'Neal sought refunds of the payment, which were effected by crediting their gift tax "account."

10

*See* Pl. Ex. 4 at 16; Ex. 5 at 4; Ex. 173.[8]  Of the overpayment, $737,000 was applied to Mr.

O'Neal's unpaid gift tax, while $700,000 was applied to Mrs. O'Neal's unpaid gift tax.  *See* Def.

Exs. 32, 36.  At all relevant times, the Government contends, Mr. and Mrs. O'Neal had separate

banking accounts, and none of Mrs. O'Neal's accounts were included as part of Mr. O'Neal's

estate when he died.  *See* Def. Exs. 1, 38-39.  Estate Examiner Suzanne Paulson determined that

Mr. O'Neal's gross estate must be increased by $700,000 to include the amount from his account

used to pay Mrs. O'Neal's gift tax.  *See* Def. Exs. 4-5.

## V.  Facts Pertaining to Reduction in Deduction for 1988 Alabama Income Tax Liability (Defendant's Issue 4)

Mr. and Mrs. O'Neal filed joint federal and state income tax returns for 1987.  *See* Def.

Exs. 37, 40.  On the federal return, Mr. and Mrs. O'Neal did not report the $1,437,000 estimated

income tax payment that had been transferred to cover the O'Neals' 1987 gift taxes.  *See* Def.

Ex. 37.  On the state income tax return, the O'Neals deducted the federal tax payment of

$1,437,000.  *See* Def. Ex. 40.  After Mr. O'Neal died, Mrs. O'Neal subsequently claimed that the

couple had not received any state tax benefit from the deduction because their Alabama income

was insufficient to absorb the deduction for that year.  *See* Def. Ex. 32.

In April 1989, Mrs. O'Neal filed joint federal and state income tax returns for the 1988

tax year.  On the state income tax form filed for 1988, no deduction was taken for any portion of

the $1,437,000 applied to the gift taxes.  *See* Def. Ex. 41.  In August 1990, Mrs. O'Neal

amended the 1988 state tax return, requesting a refund of Alabama income taxes on the grounds

that the deduction for the gift taxes should be allowed in 1988.  *See* Def. Ex. 42.  *See also* Def.

---

[8]At oral argument the plaintiffs acknowledged that the O'Neals' agent had requested the payment of gift taxes as described.

Exs. 32, 36. In December 1990, a refund check was issued to Mr. and Mrs. O'Neal jointly. *See* Def. Exs. 4, 32. On Mr. O'Neal's estate tax return, the Government contends, the estate claimed a deduction for Mr. O'Neal's share of the 1988 state income tax liability incurred by him and Mrs. O'Neal. *See* Def. Ex. 1 at Form 706, Schedule K. The deduction totaled $93,797. During the subsequent IRS examination, the IRS determined that the deduction should only have been $38,054, and thus it increased O'Neal's gross estate by $55,743. *See* Def. Exs. 4-5.

## VI. Facts Pertaining to Deduction for Unpaid Gift Taxes (Plaintiffs' Second Motion)

Plaintiffs put forth two separate expert opinions[9] as to the actual date-of-death value of the stock given to the donees that should have been reported for gift tax purposes. According to plaintiffs, the values were severely understated, and thus the estate is entitled to a deduction on the amount of unpaid taxes, penalties, and statutory interest. The first expert is Carey T. Frazier, a retired IRS Estate Tax Attorney. After discussing Frazier's qualifications and methods, *see* Pl. Second Br. at 4-6, plaintiffs note several of his conclusions. Frazier opined that the likelihood that Mr. O'Neal's gift tax return would have been chosen for an audit was 90% to 100%. *See* Pl. Ex. 55 at 4, 6. Frazier also concluded that the fair market value of the stock would have been determined by the IRS to be $250 per share. *Id.* at 7. Plaintiffs note that this figure would have resulted in a total gift tax liability of $5,049,943. *Id.* As Mr. O'Neal only paid $820,665 in gift tax, there would have been an underpayment of gift tax in the amount of $4,229,278. *Id.* Frazier further opined that a 30% undervaluation penalty would have been imposed in the amount of $1,268,683 under 26 U.S.C. § 6660 as it was written at the time. *Id.* Frazier also concluded that $173,922 would be due in statutory interest. *Id.* In total, Frazier opined that the estate was liable

---

[9]As will be discussed below, the Government objects to these experts.

12

for $5,671,983 in unpaid gift tax, penalties, and interest. *Id.*

Plaintiffs' other expert, William F. Bullock, presents similar opinions. As with Frazier, plaintiffs discuss Bullock's qualifications and methods. *See* Pl. Second Br. at 7-9. Bullock opined that there was a 95% probability that Mr. O'Neal's estate tax return would be examined and a 95% probability that the 1987 gift tax return would be examined in conjunction with the estate tax return. *See* Pl. Ex. 54 at 12-13.[10] Bullock also opined that the IRS would have asserted a value of $230 per share for the Class A stock, and $248 per share for the Class B stock. *Id.* at Tab B, pages 13-14. Using these figures, the correct gift tax owed was $4,617,724, resulting in an underpayment of $3,797,059. *Id.* at Tab B, pages 1, 32. Bullock also concluded that a 30% penalty would be assessed totaling $1,139,118. *Id.* at Tab B, pages 29. He also opined that there would be statutory interest in the amount of $156,147.32. *Id.* at Tab B, pages 2, 32. Thus, Bullock's opinion is that the estate owes a total of $5,092,324 in unpaid gift tax, penalties, and interest.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

---

[10]Bullock did opine that there was only a 65% probability that the gift tax return alone would be examined. *See* Pl. Ex. 54 at 12-13.

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Burden of Proof

Before addressing the merits of each issue, both sides present arguments as to the applicable burden of proof. The Government contends that the plaintiffs bear the burden of proof in this action. In general, it notes, a statutory notice of tax deficiency is presumed to be accurate. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933)(Commissioner's ruling "has the

14

support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong."). *See also* 26 U.S.C. § 7422(e). The Government contends that this burden includes establishing the amount of the deduction claimed.

Plaintiffs counter by arguing that the language of § 7422(e) shows that it applies only to issues raised as counterclaims or through intervention, neither of which has happened here. Plaintiffs also contend that the presumption of correctness articulated in *Welch* was based upon a ruling by the Commissioner of Internal Revenue. Here, some of the arguments made by the Government are raised for the first time, i.e., there has been no ruling on these issues by the Commissioner. Also, plaintiffs contend, many of the arguments made by the Government involve including, not deducting, items from the estate. Thus, *Smith v. Commissioner*, T.C. Memo 2001-303 (2001), which dealt with deductions, is also inapplicable. *See* Pl. Response at 3. Finally, with respect the Government's 26 U.S.C. § 2035(b) argument, (see below), plaintiffs argue that the Government bears the burden to show a reasonable basis for the setoff. *See Missouri Pac. R.R. Co. v. United States*, 411 F.2d 327, 329 (8th Cir. 1969). *See also* Pl. Response at 4.[11]

## II. Deductions for Certain Donees' Claims (Defendant's Issue 1 and Plaintiffs' First Motion)

### A. Defendant's Position

The Government argues that the estate is not entitled to a deduction for the donees' claims under 26 U.S.C. § 2053(a)(3). Section 2053(a)(3) provides that, in determining the taxable estate, a deduction is allowed "for claims against the estate . . . as are allowable by the

---

[11]See the recorded oral discussions of September 16, 2003 for the parties' comments on burden of proof.

laws of the jurisdiction, whether within or without the United States, under which the estate is being administered." However, the Government contends, state law alone is not determinative. Rather, other requirements found in the Treasury regulations must also be satisfied. *See, e.g., Estate of Chagra v. Comm'r*, T.C. Memo 1990-352, 1990 WL 94717 ("The phrase 'as are allowable by the . . . jurisdiction . . . under which the estate is being administered'. . . establishes a threshold and not an exclusive condition; the requirements of respondent's regulations must also be satisfied."), *aff'd*, 935 F.2d 1291 (5th Cir. 1991).

First, the Government argues, "[t]he amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, and interest thereon which had accrued at the time of death. . . . Only claims enforceable against the decedent's estate may be deducted. . . . Liabilities imposed by law or arising out of torts are deductible." 26 C.F.R. § 20.2053-4. Second, an item may be claimed as a deduction "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate." 26 C.F.R. § 20.2053-1(b)(3).

With respect to whether these particular donee claims are deductible, the Government contends that there is a two-pronged test. The first question is whether a deduction is available. *See Estate of Smith v. Comm'r*, 198 F.3d 515, 521 (5th Cir. 1999). The second prong is a determination of the "correct amount," or value, of the deduction. *Smith*, 198 F.3d at 521.

The Government contends that the Eleventh Circuit has addressed the issue of how to value claims sought to be deducted under § 2053(a)(3). Adopting the principles announced in *Ithaca Trust Co. v. United States*, 279 U.S. 151 (1929), the court stated that the deduction "must

16

be valued as of the date of the decedent's death. Events occurring after the decedent's death that alter the value must be disregarded. " *Estate of Elizabeth P. O'Neal v. United States*, 258 F.3d 1265, 1266 (11th Cir. 2001)(citation omitted). The court also gave the following guidance:

> On remand, the district court is instructed neither to admit nor consider evidence of post-death occurrences when determining the date of death value of the Section 2053(a)(3) deduction. It will be incumbent on each party to supply the district court with relevant evidence of pre-death facts and occurrences supporting the date of death value of the deduction as advocated by that party. The district court will then, by using informed judgment, reasonableness and common sense, weighing all relevant facts and evaluating their aggregate significance, determine a sound valuation.

258 F.3d at 1275 (citations and footnote omitted). The court did note two exceptions, the Government contends, based upon the case *Estate of Hagmann v. Commissioner*, 60 T.C. 465 (1973), *aff'd*, 492 F.2d 796 (5th Cir. 1974): (1) where the claim is classified as a "potential claim without an existing claimant," or (2) where the claim is classified as having an "identifiable claimant without a cognizable claim" ("*Hagmann* exceptions"). *See* 258 F.3d at 1272 n.24.[12] However, the Government contends, the facts of this case do not fit within the *Hagmann* exceptions. *See Estate of Armstrong v. United States*, 132 F. Supp. 2d 421 (W.D. Va. 2001)("Not only was the possibility of an additional gift tax assessment purely conjectural, but, in the event that additional gift taxes were to be imposed, the amount of such an assessment was unpredictable [at the time of the gift]."), *aff'd*, 277 F.3d 490 (4th Cir. 2002). *See also* Def. Ex. 26 at 11 (expert opinion that claims were too speculative).

    Here, the Government argues, the value of any donee claims would be zero. Mr. O'Neal died on August 7, 1988. The Government argues that, at the time of his death, only the

---

[12]Plaintiffs counter that the court did not recognize the exceptions. *See* Pl. Response at 5 n.4.

following events had occurred: Mr. O'Neal made gifts of O'Neal Steel stock in November, 1987.

On or before April 15, 1988, Mr. O'Neal filed a gift tax return for the year 1987. In that return,

Mr. O'Neal valued the Class A and Class B stock as $54 and $61, respectively. No appraisals of

the O'Neal stock had been performed as of the date of the gifts. Mr. O'Neal never made any

effort to amend his 1987 gift tax return. As of the date of his death, the IRS had not selected his

gift tax return for review. None of the donees had made any assertions of any claims against Mr.

O'Neal seeking reimbursement of any gift tax that might be payable by them. In sum,

Government contends, the donees' claims are not susceptible of valuation since the donees were

not subject to any definite liability at the time of Mr. O'Neal's death.

Alternatively, the Government argues, even assuming that the claims were susceptible of

valuation, "the value of their claim as of the date of Mr. O'Neal's death would be zero,

regardless of what amount of gift tax deficiency might have been asserted with respect to the

gifts." *See* Def. Ex. 26 at 15 (expert report of Larry J. White).[13] This conclusion results because

"[e]ither (i) the estate's probate assets would be exhausted by federal tax claims with priority

over other claims, leaving no assets to pay a restitution claim; or [(ii)] the additional gift tax

asserted on Mr. O'Neal's 1987 gifts would be fully satisfied out of the estate's probate assets, so

that no transferee liability would be imposed on the donees . . . ." *Id.* at 16-26.

Also, the Government contends, even assuming that the donees' claims had a value

greater than zero, any tax benefit to Mr. O'Neal's estate would be zero because the amount of

such a deduction must be offset by a corresponding increase in Mr. O'Neal's gross estate under

---

[13]Plaintiffs have filed a motion to disqualify White. *See* Doc. 68. Essentially, plaintiffs argue, White lacks experience in this area, and he used improper methodology (including looking at post-death events) in reaching his conclusions. The Government has filed a response disputing these claims. *See* Doc. 72.

26 U.S.C. § 2035(b).[14]  Section 2035(b), provides:

> The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse during the 3-year period ending on the date of the decedent's death.

The Government cites *Estate of Sachs v. Commissioner*, 88 T.C. 769 (1987), *rev'd in part on other grounds*, 856 F.2d 1158 (8th Cir. 1988), which interpreted this provision.  The court in *Sachs* held that a decedent's gross estate must include the amount of any gift tax paid by donees on gifts made within three years of the decedent donor's death.  88 T.C. at 769.  The court went beyond the plain language of the statute, noting that "[a]n important purpose of the gift tax was to prevent or compensate for avoidance of the estate tax."  *Id.* at 774.  The court also noted the Tax Reform Act of 1976, which was designed to "reduce the disparity of treatment between lifetime gifts and transfers at death."  *Id.* at 775.  The court concluded that

> Insistence on the literal language of section 2035(c) would distort the framework erected by the Tax Reform Act of 1976. The Act retained some of the prior law's preferences for lifetime gifts; however, these preferences were not made available to deathbed gifts. Petitioners' construction of section 2035(c) extends the benefit of one such preference to deathbed net gifts. Mechanical application of section 2035(c) would completely remove from the transfer tax base all funds used to pay gift tax on such gifts. This interpretation of the statute is wholly inconsistent with Congress' goal of sharply distinguishing deathbed gifts from other gifts and eliminating the disparity of treatment between deathbed gifts and transfers at death.

*Id.* at 777.  *See also* Def. Br. at 34-36 (discussion of *Sachs*).  The same rationale applies here.[15]


### B. Plaintiffs' Position

---

[14]Apparently, this section was codified as § 2035(c) during the events in question.  Substantively, there is no difference.

[15]The Government does note that if this rationale is adopted by the court, there will be a minimal increase in the estate tax owed by Mr. O'Neal's estate.  *See* Def. Br. at 38.

19

Addressing the Government's two-pronged approach, plaintiffs argue that the first question, the availability of the deduction, was thoroughly litigated and answered with respect to Mrs. O'Neal's estate. The Probate Court of Jefferson County, Alabama determined that the donees' claims against Mrs. O'Neal's estate were valid and enforceable. *See* Pl. Ex. 3 at 9. The district court agreed, and the Eleventh Circuit affirmed. *See Estate of Elizabeth P. O'Neal v. United States*, 81 F. Supp. 2d 1205, 1218 (M.D. Ala. 1999), *aff'd*, 258 F.3d 1265 (11th Cir. 2001).

As to the second prong, i.e., the value of the deduction, plaintiffs agree that the Eleventh Circuit adopted the "snapshot" rule announced by the Supreme Court in *Ithaca Trust. See Estate of Elizabeth P. O'Neal*, 258 F.3d at 1271. At trial, plaintiffs contend, they will present the "valuation snapshot" through four experts[16] using the methodology announced by the Eleventh Circuit in *O'Neal* to determine (i) the facts as of the date-of-death; (ii) the foreseeable outcome of the donees' liability for Mr. O'Neal's gift taxes, penalties, and interest; and (iii) the foreseeable outcome of the assertion of the donees' liability as a claim against the estate. *See* Pl. Exs. 54, 55, 162, 182. *See also Estate of Elizabeth P. O'Neal*, 228 F. Supp. 2d 1290, 1298-1302 (M.D. Ala. 2002)(on remand from Eleventh Circuit's *O'Neal* opinion). For the second issue, plaintiffs rely on the conclusions of two of these experts, Frazier and Bullock, which are recited above in the statement of facts.

For the third issue, plaintiffs rely on the opinions of two practitioners, Sam C. Pointer,

---

[16]The Government has filed a motion to disqualify all four of these experts. *See* Doc. 45. As grounds for the motion, the Government contends that plaintiffs should be judicially estopped from offering this testimony because they took inconsistent positions during the litigation involving Mrs. O'Neal. The Government also argues that the opinions are speculative, unreliable, redundant, and improperly based on post-death facts. Plaintiffs dispute these allegations. *See* Doc. 58.

Jr., and Ralph H. Yeilding.  Plaintiffs contend that this type of methodology has been accepted

by other courts.  *See, e.g., Estate of Smith*, 82 T.C.M. 909, 916 (2002); Pl. Response at 10 (other

cases).  Judge Pointer states that a claim is capable of valuation even if the "claim on the

valuation date is contingent, uncertain, or subject to dispute . . . ."  *See* Pl. Ex. 162 at 3.  Here,

four simple and undisputed facts are relevant.  First, Mr. O'Neal failed to pay all of his 1987 gift

taxes.  Second, the donees became personally liable for the gift tax.  Third, the donees' liability

created a duty on the part of Mr. O'Neal's estate to make restitution for the amounts paid by the

donees.  Fourth, a duty to make restitution constitutes a deductible claim.  *See* 26 U.S.C. § 2053.

Plaintiffs also note that nearly identical claims were given value with respect to Mrs.

O'Neal's claims.  *See* Pl. First Br. at 18.  Indeed, Treasury Regulation § 20.2053-4, cited by the

Government, states that claims may be deducted "whether or not the matured."  Plaintiffs argue

that *Estate of Armstrong*, cited by the Government, is inapplicable because it involved net gift

taxes.[17]  Plaintiffs also note numerous factual differences between *Armstrong* and this case.  *See*

Pl. Response at 12-15.  Plaintiffs cite the recent Tax Court case *McCord v. Commissioner,* 120

T.C. No. 13, 2003 WL 21089049 (May 14, 2003), in which the court explained the rationale

underlying *Armstrong*:

> Nevertheless, we agree with what we believe to be the basis of those two opinions,
> i.e., that, in advance of the death of a person, no recognized method exists for
> approximating the burden of the estate tax with a sufficient degree of certitude to be
> effective for Federal gift tax purposes.

*Id.* at 402 (Part VII-B of the opinion).  Plaintiffs contend that the *McCord* court applied this

rationale to deny the taxpayers a reduction in the value of their gifts based on the claimed

---

[17]Plaintiffs point out that in a net gift, the donee agrees to pay the donor's tax on the gift, thus reducing the
taxable amount of the gift.  *See* Pl. Response at 12 n.6.

"'mortality-adjusted present value' . . . of the [donees'] contingent obligation to pay additional estate tax that would be incurred . . . ." *Id.* at 399 (Part VII-A of the opinion). The court further reasoned:

> However, the dollar amount of a potential liability to pay the 2035 tax is by no means fixed; rather, such amount depends on factors that are subject to change, including estate tax rates and exemption amounts (not to mention the continued existence of the estate tax itself). For that reason alone, we conclude that petitioners are not entitled to treat the mortality-adjusted present values as sale proceeds (consideration received) for purposes of determining the amounts of their respective gifts at issue.

*Id.* at 402-03 (footnotes omitted)(Part VII-B of the opinion). In *Armstrong* and *McCord*, plaintiffs contend, the taxpayers sought to reduce the date-of-gift value based on net gift principles because of a contingent obligation to pay additional estate tax in the future if the donor did not survive for three years. Here, plaintiffs merely seek to quantify the date-of-death value of the donees' claims against Mr. O'Neal's estate for their transferee gift tax, penalties, and interest that arose on April 16, 1988 - before Mr. O'Neal died. The claim was not contingent, but fixed. *See* Pl. Response at 17-18.

Plaintiffs next address the Government's argument that the deduction is not allowed because the claims are not susceptible to valuation. Plaintiffs cite *Estate of Smith v. Commissioner*, 198 F.3d 515 (5th Cir. 1999), in which the court stated:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim."
>
> In fact, when addressing situations that are the obverse of the one in the instant case, i.e., when the decedent-estate taxpayer is a plaintiff rather than a defendant in a pending lawsuit, the Commissioner has considered himself capable of determining the value of a pending lawsuit in exact dollars and cents, even when the claim has not been reduced to judgment. Furthermore, courts have consistently held that "inexactitude is often a byproduct in estimating claims or assets without an

22

> established market and provides no excuse for failing to value the claims . . . in the
> light of the vicissitudes attending their recovery."

*Id.* at 525-26 (footnotes and citations omitted). Thus, plaintiffs argue, there is well-established

methodology for valuing these claims. *See* Pl. Response at 19-20.

Plaintiffs also address the Government's contention that any deduction would be offset

by an increase in the estate under § 2035(b). First, plaintiffs contend that this defense was not

raised in the IRS Notice of Deficiency or in the Government's answer. *See* Pl. Response at 20,

24-25 (discussing Fed. R. Civ. P. 8(c)); Pl. Ex. 182. Second, plaintiffs contend, *Sachs* (relied

upon by the Government) relied on net gift tax principles and is thus inapplicable. Applying net

principles to this case would result in the IRS taxing the donor for more than the amount that was

actually transferred. *See* Pl. Response at 20-21 (hypothetical example).[18] Plaintiffs also note

that in a net gift situation, the donee is simply acting as the agent of the donor, not as someone

paying his or her own direct liability to the IRS. *See Sachs*, 88 T.C. at 778. Thus, in a net gift

situation, it does not harm the statute to hold that the tax is paid by the donor or the donor's

estate. Here, the donees' are only liable because Mr. O'Neal failed to timely pay his gift tax, not

because they were contractually obligated to do so.

Plaintiffs also argue that the Government's "offset" argument is not supported by the

plain language of the statute. Section 2035(b) states that the gross estate shall be increased "by

the amount of any tax paid under chapter 12 by <u>the decedent or his estate</u>." (Emphasis added).

Congress could have included the language "or paid by donees," but it did not. Neither §

2035(b) or §2053 speak of an offset. They are independent provisions. Even if the statute is

---

[18]The Government disputes these calculations. *See* Def. Reply at 10-11.

ambiguous, plaintiffs note, revenue laws are construed against the taxing power and in favor of the taxpayer. *See Tandy Leather Co. v. United States*, 347 F.2d 693, 695 (5th Cir. 1965). *See also* Pl. Response at 22-24. Plaintiffs also contend that even if an offset was due because of amounts paid by the donees, the amount should be $489,360, not the $700,000 sought by the IRS in its Notice of Deficiency. *See* Pl. First Br. at 28-30.

Lastly, plaintiffs argue, the donees filed timely claims against Mr. O'Neal's estate. Plaintiffs note that Alabama Code § 43-2-60 requires personal representatives to give notice of their appointment and to provide certain information. The notice must inform persons that their claims will be barred if not properly filed. Alabama Code § 43-2-350 sets out the appropriate time limits. However, as noted above, plaintiffs' experts assert that the donees' claims were "contingent, uncertain, or subject to dispute." *See* Pl. Ex. 162 at 3. Plaintiffs contend that there is an exception to the general rule where a claim is contingent. Plaintiffs cite *Farris v. Stoutz*, 78 Ala. 130 (1884), where the court stated:

> All claims which are absolute and unconditional, whether payable presently or in the future, must be presented within [six months] after the grant of letters testamentary, or of administration. "It is only contingent claims --claims which may never accrue – that fall within the provision postponing a presentment until eighteen months after the same have accrued." A claim dependent upon a future contingency--on the happening of an event which may never happen--does not accrue until the event happens; until then it is not a claim.

*Id.* at 133 (citation omitted). This language, plaintiffs note, does not contain any "should have known" or "were well aware of" language. In essence, the time prescribed in § 43-2-350 is tolled until the event happens. *See also Edgehill Corp. v. Hutchens*, 213 So. 2d 225 (Ala. 1968).

While the donees' liability arose at 12:01 a.m. on April 16, 1988, plaintiffs contend that the amount of liability, which must be known to make the claim "absolute and unconditional,"

was not known until the transferee litigation. Again, plaintiffs argue, it is the happening of an

event, not the awareness of the claimant, that starts the statute running. *Farris*, 78 Ala. At 133.

Even if awareness was an issue, plaintiffs contend, the IRS first mentioned transferee liability in

the April 1992 Notice of Deficiency. The donee's claims were filed a little over two months

after these notices were received.

Plaintiffs also assert that the donees' claims were timely because, under Alabama law,

they were entitled to actual notice by mail that their claims must be presented within a certain

time limit. *See* Ala. Code § 43-2-61(1). Persons who are entitled to an actual notice have thirty

days from the date of the notice to file their claims. *See* Ala. Code § 43-2-350. Plaintiffs assert

that the donees never received this actual notice. *See* Pl. Ex. 4 at 5. Thus, the donees' claims by

definition were timely filed. *See Clark v. Jefferson Fed. Savings & Loan*, 571 So. 2d 1032, 1034

(Ala. 1990)("The record supports the trial judge's finding that Jefferson Federal was a known

creditor, as well as his conclusion that the letter to Jefferson Federal from the attorney for the

estate more than a year after the letters of administration were granted to Clark did not inform

the bank of the need to file a claim."). *See also* Pl. First Br. at 26-28 (discussing case).

C. Defendant's Response

The Government disputes plaintiffs' reliance on the litigation involving Mrs. O'Neal.

The plaintiffs' interpretation of these cases, the Government contends, fails to take into account

the difference in dates on which the two died. Mr. O'Neal died on August 7, 1988, while Mrs.

O'Neal died on July 23, 1994. Because of these differences in dates, the pre-death facts vary

significantly. First, the Government argues, the statute of limitations for assessing and collecting

any unpaid gift taxes from the donors had expired as of Mrs. O'Neal's death, but not Mr.

25

O'Neal's. Second, the IRS had commenced an examination of Mrs. O'Neal's gift tax return, but not Mr. O'Neal's. Third, the IRS had proposed to assess transferee liability against the donees as of Mrs. O'Neal's death, but not Mr. O'Neal's. Fourth, appraisals of the stock existed at Mrs. O'Neal's death, but not Mr. O'Neal's. Fifth, the donees had begun litigation to contest the proposed transferee liability as of Mrs. O'Neal's death, but not as of Mr. O'Neal's. And finally, the donees had asserted their alleged reimbursement claims against Mr. O'Neal's estate as of Mrs. O'Neal's death, but they had not as of Mr. O'Neal's death. *See* Def. First Response at 4-8 (discussion of prior litigation).

The Government also discusses the rulings of the various cases involved with Mrs. O'Neal's estate. The Government contends that the district court did not hold that the donees' claims against Mrs. O'Neal's estate existed at the date of her death, but instead based its decision on post-death events. *See Estate of Elizabeth P. O'Neal*, 81 F. Supp. at 1205. The Eleventh Circuit did not address the issue, as the Government dismissed the issue on appeal. *See Estate of Elizabeth P. O'Neal*, 258 F.3d 1271 n.20. *See also* Def. First Response at 5-6. The Government also notes that the Probate Court dismissed the donees' claims against Mrs. O'Neal's estate as "premature." *See* Pl. First Response at 6-7, Attached Exs. A-B. This decision shows that the donees' claims had not accrued as of the date of Mrs. O'Neal's death.

The Government then addresses plaintiffs' argument that *Armstrong* is inapplicable because it involves net gift taxes. The Government contends that *Armstrong* stands for the proposition that a possible assessment of additional gift tax is too conjectural and speculative to be susceptible to valuation. As noted above, as of August 7, 1988, the donees' obligation and/or Mr. O'Neal's obligation to pay additional gift taxes was unknown. *See* Def. Reply at 6-7.

Next, the Government addresses the "setoff" argument under § 2035(b). The Government contends that this argument is not an affirmative defense or avoidance that needed to be specifically pled. The Government cites *Lewis v. Reynolds*, 284 U.S. 281 (1932), in which the court stated:

> "[T]he ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him."
>
> . . .
>
> While the statutes authorizing refunds do not specifically empower the Commissioner to reaudit a return whenever repayment is claimed, authority therefor is necessarily implied. An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.

*Id.* at 283 (citation omitted). This defense of lack of overpayment applies in a refund suit where the taxpayer's claim and the Government's setoff involve "the same tax for the same year by the same taxpayer . . . ." *See Dysart v. United States*, 340 F.2d 624, 627 (Ct. Cl. 1965). In these cases, "the government's right to raise such a defense is unconditional" and not subject to equitable considerations. *Id.* at 627. "[T]he government and the individual taxpayer have the legal right to raise a setoff without having to appeal to the court's discretion or to its evaluation of the particular equities." *Id.* at 628.

Thus, the Government contends, with respect to a "setoff" defense, no special pleading is required. *See, e.g., Sara Lee Corp. & Subsidiaries v. United States*, 29 Fed. Cl. 330, 338 (Fed.

27

Cl. 1993). Even if such a defense was an affirmative defense or avoidance, the Government

notes, the offset defense was expressly included in the pretrial order in this case. *See* Def. Reply

at 9. Thus, plaintiffs cannot now allege waiver. *See Jackson v. Seaboard Coast Line R.R. Co.*,

678 F.2d 992, 1012 (11th Cir. 1982)("The failure to include an affirmative defense in the answer

or have it included in the pre-trial order of the district court, which supersedes the pleadings, will

normally result in waiver of the defense.")(emphasis added). Also, plaintiffs have not been

prejudiced as they have had timely notice of the defense. *See* Pl. Exs. 1 at 3, 180 at 2-4. *See*

*also* Def. Reply at 9.

The Government also address plaintiffs' "plain meaning" argument with respect to §

2035(b). The Government notes that the Eleventh Circuit has held:

> [U]nless there is some ambiguity in the language of a statute, a court's analysis must
> end with the statute's plain language. When we examine the meaning of statutory
> words or phrases, however, we cannot examine statutory provisions in isolation. "It
> is a fundamental canon of statutory construction that the words of a statute must be
> read in their context and with a view to their place in the overall statutory scheme."

*Nyaga v. Ashcroft*, 323 F.3d 906, 914 (11th Cir. 2003)(citations omitted). However, in cases

where the language is unclear, resorting to extrinsic material is appropriate. *See Federal Reserve*

*Bank of Atalanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000). If a statutory definition is

nonexistent, courts look to "the common usage of words for their meaning." *CBS, Inc. v.*

*PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001). Dictionaries are often

helpful. *Id.* at 1223. The Government has attached a dictionary definition of the term "paid."

*See* Def. Ex. 44.

Under the common meaning of the word "paid," as used in § 2035(b), Mr. O'Neal's

gross estate must be increased in an amount equal to the amount of any deduction allowed for the

alleged donees' claims and/or Mr. O'Neal's alleged claim for unpaid taxes. If extrinsic evidence

is required, the Government points to *Sachs* as illustrative. Any other interpretation other than

the one offered by the Government, it contends, would frustrate the Congressional intent to

"eliminate the disparity of treatment between deathbed gifts and transfers at death."

Lastly, the Government argues, plaintiffs are judicially estopped from claiming that the

donees claims were timely filed. The Government concedes that under Alabama law claims can

be deemed "contingent" and thus excepted from the applicable statutory time limits. *See* Def.

First Response at 8. However, here and in Mrs. O'Neal's litigation, the plaintiffs argued that, for

purposes of claiming the deduction, the donees' claims accrued at 12:01 a.m. on April 16, 1988.

*See* Pl. First Br. at 7. Plaintiffs cannot now assert that the claims accrued on a different date for

purposes of filing a claim with the estate. The Government also disputes the plaintiffs'

contention that the donees never received actual notice. The Government cites Alabama Code §

43-2-61, which states in relevant part that notice may be effected by mail or "any other

mechanism reasonably calculated to provide actual notice." Here, the Letters Testamentary were

granted on August 10, 1988 to four persons: one of the donors and three of the donees. Also, as

noted above, plaintiffs argue that the claims accrued at 12:01 a.m. on April 16, 1988. The

evidence also shows, the Government contends, that the donees had notice sometime in the latter

half of 1991. *See* Def. First Response at 10-11; Pl. Exs. 31, 33. Despite this knowledge, the

donees did not file their claims until June 24, 1992.

D. Plaintiffs' Response

Plaintiffs also begin by addressing the prior litigation involving Mrs. O'Neal. Plaintiffs

contend that the actual holding of the Probate Court was that "[t]he claims filed by the Claimants

against the Estate are valid and enforceable." *See* Pl. Ex. 3 at 9. The district court held: "Mrs. O'Neal's estate is entitled to a deduction for the amount of restitution paid to the donees." *Estate of Elizabeth P. O'Neal*, 81 F. Supp. 2d at 1220. The Eleventh Circuit, plaintiffs contend, stated that "[h]ere there is no dispute that the estate is entitled to a deduction with respect to claims against the estate by the [donees] for reimbursement of their transferee gift tax liability . . . ." *See* 258 F.3d at 1271. *See also* Pl. First Reply at 2-3; 4-7 (further discussion of the relationship between Mrs. O'Neal's litigation and this case). Among the issues resolved on remand, plaintiffs argue, was the district court's holding that the deduction had to have a value greater than zero. *Id.* at 4-7.

Next, plaintiffs address the estoppel argument. They contend that they have never argued or taken the position that Mr. O'Neal's estate was not entitled to a deduction for the donees' claims or that the value of those claims was zero. *See* Pl. First Reply at 3-4. As to whether the claims were timely filed, plaintiffs note, they have never argued that the claims were not timely filed, and thus there can be no estoppel as that doctrine is normally used. Also, plaintiffs contend, the Government has misconstrued its position. Plaintiffs contend that the donees' liability to pay Mr. O'Neal's gift taxes existed at 12:01 a.m. and that this concurrently triggered the liability to make restitution. The "claims" did not accrue until later. Plaintiffs also again argue that they never received notice from the personal representatives. *See* Pl. First Reply at 10-12 (citing *Clark v. Jefferson Fed. Savings & Loan*).

## III. Revaluation of "Adjusted Taxable Gifts," "Gift Tax Payable" (Defendant's Issue 2)

### A. Defendant's Position

The Government contends that any revaluation of the 1987 gifts requires an adjustment in

the "adjusted taxable gifts" and "gift tax payable" to reflect such revaluation when calculating the federal estate tax. The Government notes that 26 U.S.C. § 2001(a) imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States, while § 2001(b) describes how the estate tax is to be computed. Under this latter section, the estate tax, before the allowance of any credit, is computed by determining a tentative tax on the value of the taxable estate, plus adjusted taxable gifts, and subtracting from that amount the tax payable on gifts made after 1976.

The Government argues that in calculating the gift tax, the decedent's prior taxable gifts must be adjusted in order to reflect the accurate value of such gifts on the date that they were given, despite the fact that the gift tax statute of limitation has run. *See Estate of Elizabeth O'Neal*, 81 F. Supp. 2d at 1226. *See also* Def. Br. at 40 n.22 (other cases). Thus, a revaluation of the O'Neal Steel stock triggers revaluation of the "adjusted taxable gifts" and "gift tax payable" amounts reported on Mr. O'Neal's estate tax return. Assuming *arguendo* that a deduction is allowed for the donees' claims (see discussion above), the revaluation must be determined based upon the per share values used in computing the deduction. Even if a deduction is not allowed, the Government argues, the stock must be revalued based upon the settlement agreement reached between the IRS and the donees. This revaluation would result in the "adjusted taxable gifts" and "gift tax payable" being $3,277,752 and $1,310,025, respectively.

### B. Plaintiffs' Response

Plaintiffs also cite § 2001(b), which defines the term "adjustable taxable gifts" as follows:

31

For purposes of paragraph (1)(B), the term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which are includible in the gross estate of the decedent.

Plaintiffs agree that the adjusted taxable gifts should be $3,277,752 if the stock is valued based on the settlement amounts. *See* Pl. Response at 26. However, they argue that the gift tax payable would be $1,313,670. *See* Pl. Response at 28; Schedule A. They also contend that there is a difference between the determination of the adjusted taxable gifts and the determination of the date-of-death value of the estate's liabilities. The latter is determined under the "snapshot" rule, while the former can be extended beyond death by various statutes of limitation. *See, e.g.,* 26 U.S.C. § 6501(a).

### C. Defendant's Reply

In addition to its original arguments, the Government disputes plaintiffs' figure of $1,313,670 for the gift tax payable. The Government contends that it is unable to respond in detail because plaintiffs have failed to provide it with the calculations underlying the figures in Schedule A. However, even a preliminary examination shows that the figures in Schedule A do not agree with information previously submitted to the IRS. For example, Schedule A indicates that the total taxable gifts for the pre-1977 period are $233,507.21, while Mr. O'Neal's gift tax return shows that the total taxable gifts are $243,507.21. *See* Def. Reply Br. at 15-16 (other examples). If plaintiffs' figures are correct, the Government notes, there would have to be a corresponding increase in adjusted taxable gifts, although plaintiffs have noted no such increase.

## IV. Inclusion of Funds Used to Pay Mrs. O'Neal's Gift Taxes (Defendant's Issue 3 and Plaintiffs' Third Motion)

### A. Defendant's Position

The Government contends that Mr. O'Neal's estate should be increased by $700,000 in order to reflect that Mr. O'Neal's funds were used to pay a portion of Mrs. O'Neal's gift taxes for 1987. *See* 26 U.S.C. § 2035(b). The Government again notes that the purpose of § 2035(b) is to eliminate any incentive to make deathbed transfers in order to remove an amount equal to the gift taxes from the gross estate. *See, e.g., Brown v. United States*, 329 F.3d 664, 674 (9th Cir. 2003)(Section 2035(b) "was designed to reverse the effect of funds transferred out of an estate within three years of death."). Also, the Government notes, § 2035(c) "presumes that gifts made within three years of death are made with tax-avoidance motives and eliminates the tax advantage for those death bed transactions." *Brown*, 329 F.3d at 668. In *Brown*, the Government argues, the decedent's gross estate was increased because his funds were used to pay his wife's gift taxes, irrespective of the fact they elected to split their gifts under § 2513. *Id.* at 674-78.

The Government apparently concedes that if Mrs. O'Neal had paid the $700,000 herself, the payment should not be included in Mr. O'Neal's gross estate under § 2035(b). *See* Def. Br. at 43. However, the Government contends, that is not the case here. While plaintiffs may argue that this payment was a gift, the evidence is to the contrary. Here, the entire $700,000 gift tax payment was made entirely from Mr. O'Neal's separate funds. *See* Def. Ex. 34. The check was drawn on the account of Mr. O'Neal, an account to which Mrs. O'Neal was not named. *Id.* A letter from Mr. O'Neal's attorney also confirms that the payment was made from Mr. O'Neal's separate funds. *See* Def. Ex. 32. Furthermore, Mr. and Mrs. O'Neal each had separate checking accounts and separate accounts with Merrill Lynch. *See* Def. Exs. 38-39. Neither of Mrs. O'Neal's accounts were listed as assets in Mr. O'Neal's gross estate. *See* Def. Ex. 1, Form 706,

33

Schedule C. Finally, the Government notes, Treasury regulations specifically exclude such payments of income or gift tax from being treated as gifts. *See* 26 C.F.R. § 25.2511-1(d).

The Government notes that the case *Vaughan v. Borland*, 175 So. 367, 369 (Ala. 1937) arguably stands for the proposition that there is a presumption of joint ownership of personal property of a married couple. However, the court specifically stated:

> When there is a joint possession by husband and wife, the law refers the legal possession to the one who has the title, if that can be ascertained.
>
>     . . .
>
> Without now denying a rule which would allow an administrative presumption in favor of a creditor of the husband levying on property as his, which is in the joint possession of husband and wife, nor likewise a rule which would allow such an administrative presumption in favor of a creditor of the wife levying on property as hers, which is in their joint possession, since they would ordinarily be peculiarly possessed of knowledge of such ownership rather than the creditor, we think that considering the present status of a married woman's property rights there is a presumption of their joint ownership of personal property jointly possessed by them when the question of ownership arises in a controversy between them or their personal representatives, respectively, and the evidence does not show whether one or both own it. We see no reason to penalize the wife in respect to presumptions when she is not penalized with respect to the incidents of ownership and possession in any other respect. As to their personalty, the rights of ownership, enjoyment, and disposition by husband and wife, respectively, are the same as between strangers in social relation. They are necessarily in the joint possession of much personal property. That possession as between them should not reflect upon her right to sustain a claim of ownership. We think their joint possession of such property raises a presumption of joint ownership, which gives way to direct or circumstantial evidence to the contrary, sufficient to lead to a different conclusion.

175 So. at 368-69 (citations omitted)(emphasis added). Here, the evidence does show that the funds were Mr. O'Neal's separate funds. According to the Government, the presumption announced in *Vaughan* has been rebutted.

The Government also disputes whether the $1,437,000 was an overpayment or refund. The Government notes that 26 U.S.C. § 6401(a) only allows a refund when there has been an

overpayment. An "overpayment" is defined as "that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto." 26 U.S.C. § 6401(a). However, the Government notes, § 6402(a) applies to money that comes into the hands of the Government because of an overpayment of a particular tax liability. *See* 26 U.S.C. § 6402(a) ("In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment."). Further, § 6513(b)(2) provides in pertinent part: "Any amount paid as estimated income tax for any taxable year shall be deemed to have been paid on the last day prescribed for filing the return under section 6012 for such taxable year (determined without regard to any extension of time for filing such return)."

Applying these principles, the Government argues, no overpayment or refund arose from Mr. and Mrs. O'Neal's 1987 income tax return. No such overpayment was disclosed or requested on their 1987 income tax return. Mr. O'Neal's remittance of $1,437,000 was simply a deposit prior to April 15, 1988. Before the April 15 deadline, the IRS was directed to transfer the remittance and apply it in partial payment of Mr. and Mrs. O'Neal's gift taxes. There was simply no refund.

Even if this could be considered a refund, the Government contends, there is no proof that the funds were jointly owned by Mr. and Mrs. O'Neal. The Government argues that overpayments by married couples are apportionable to each spouse to the extent that he or she contributed to the overpaid amount. *See Ragan v. Comm'r*, 135 F.3d 329, 333 (5th Cir. 1998)(citation omitted). *See also* Def. Br. at 49 n.28 (other cases). "Spouses who file a joint

35

return have separate interests in any overpayment, the interest of each depending upon his or her

relative contribution to the overpaid tax." *In re Kleinfeldt*, 287 B.R. 291, 293 (Bankr. D. Wyo.

2002). The $700,000 should be included in Mr. O'Neal's gross estate.

B. Plaintiffs' Position

Plaintiffs cite two IRS Technical Advice Memoranda to support their position with

respect to § 2035(b) that the intent of the parties, not the source of funds, governs the issue.

According to plaintiffs, Technical Advice Memorandum 8515001 rejected the Government's

source of funds theory.[19] *See* Pl. Third Br. at 5-6 (discussing memorandum).  In addition,

Technical Advice Memorandum 9729005 makes clear that the IRS's conclusion is based upon

the intent of the parties. Plaintiffs quote extensively from that memorandum:

> Similar transactions took place the following April when it came time to pay the gift
> taxes due on the gifts made during the previous year. On April 13, 1993, the
> Decedent wrote two checks payable to the Spouse in the exact amount necessary to
> pay his and her federal gift tax liabilities assuming that they agreed to split all the
> gifts made the previous year. On April 14, 1993, the Decedent and the Spouse filed
> gift tax returns agreeing to split the gifts, and the Spouse wrote two checks to the
> Internal Revenue Service using the funds the Decedent had transferred to her the day
> before. Apart from the money transferred to her by the Decedent, the Spouse had no
> other resources with which to pay her gift tax liability. Based on the facts, it is clear
> that the Decedent transferred the money to the Spouse with the understanding that
> the Spouse would use it to pay their gift tax liabilities.
>
> In the present situation, the Decedent transferred to the Spouse the exact
> amount of cash needed to pay the gift taxes due on the Decedent's and the Spouse's
> returns. The only discernable purpose for this transaction was to reduce the
> Decedent's gross estate by the amount of the gift taxes paid. Thus, by running the
> payment through the Spouse's bank account, the Decedent attempted to do indirectly
> what he could not do directly. In substance, the Decedent paid gift taxes in the
> amount of $1,415,732 on gifts made by the Decedent
> and the Spouse during the three-year period ending on the date of the Decedent's

---

[19]Plaintiffs note that they are not citing the Technical Advice Memorandum as precedent, but rather to show
the IRS's position on certain issues. *See* Pl. Third Br. at 5 n.5. The Government notes that Congress has prohibited
the use of Technical Advice Memoranda as precedent. *See* Def. Third Response at 3 n.2.

death. The Decedent's gross estate, therefore, is increased by the amount of these gift taxes under § 2035(c).

(Emphasis added). Thus, plaintiffs argue, the IRS is concerned with decedents doing indirectly what they cannot do directly. Here, there is no evidence of such an intent.

Plaintiffs also dispute whether *Brown*, cited by the Government, supports a rule that ignores the intent of the parties.[20] According to plaintiffs, the Ninth Circuit carefully explained that its decision was based upon the application of the step transaction doctrine and its conclusions that the decedent's wife had acted as a mere conduit or intermediary for the funds pursuant to a plan devised by the decedent and his tax attorney. *See Brown*, 329 F.3d at 672. In *Brown*, the spouse merely acted as an intermediary in a series of "formally distinct steps in an integrated transaction," i.e., a step transaction. *Id.* at 671. Plaintiffs then quote *Brown* at length to demonstrate the factual differences between that case and this case:

> Prior to his death, Willet sought the advice of an estate tax attorney. Together, the two developed a plan pursuant to which Willet's entire net estate would be placed in a marital trust upon his death. During her life, Betty would be the income beneficiary of this marital trust. Through the operation of the marital deduction rules of § 2056 this arrangement allowed Willet both to provide financial stability to Betty and to defer the collection of estate taxes until after Betty's death. *See Brown v. United States*, 2001 WL 1480293, 88 A.F.T.R.2d. 2001-6665, *1 (C.D.Cal.2001).
>
> As part of this plan Willet also created an insurance trust to hold life insurance on Betty's life, presumably so that the heirs receiving the estate property upon her death could use the life insurance proceeds to pay estate taxes. To fund the life insurance trust Willet gave Betty a gift of $3,100,000. Betty promptly wrote a check from her separate checking account for that amount in favor of the life insurance trust.
>
> . . .

---

[20]Plaintiffs contend that *Brown* and Technical Advice Memorandum 9729005 are the same case. *See* Pl. Response at 29 n.10.

Back to our story: Willet and his attorney realized at the time of the life insurance trust transaction, that in light of § 2035(c)(1993), it was a better actuarial bet for Betty, rather than Willet, to pay the gift taxes. True, if Betty paid the gift taxes and then died within three years of doing so, her estate might owe estate taxes on the gift taxes through the operation of § 2035(c)(1993). But Betty, age 71, was more likely to outlive the 3-year reach of § 2035(c)(1993) than was Willet, age 87. A good plan, but the couple faced a practical problem: Betty had little money of her own and was therefore unable to make the necessary payments from her separate property.

So Willet, on the advice of his estate tax attorney, gave Betty two checks totaling $1,415,732, which she deposited in her own account. The next day she drew two checks from her personal account payable to the IRS for the identical amount, in satisfaction of the gift tax liability. (Because gifts between spouses are tax free, the gifts from Willet to Betty enabling this actuarial wager did not otherwise risk any gift or estate tax liability.) As the Brown estate admits, this money was given to Betty on the "understanding" that Betty would use it to satisfy the gift tax liability. Betty was, however, under no legally enforceable obligation to use the funds in that fashion.

*Id.* at 668-69 (footnotes omitted).  The Ninth Circuit noted that the district court held in favor of

the IRS based on the step transaction doctrine:

Applying the "step transaction" doctrine, the district court determined that the transactions leading up to Betty's satisfaction of the gift tax liability should be treated, for tax purposes, as one integrated transaction. Using that approach, Willet becomes the taxpayer, as the gift tax payment traces back to Willet's gift to Betty of the precise amount of the tax. We agree with the district court that the gift tax payment is properly attributed to Willet.

*Id.* at 669.  The Ninth Circuit further explained that the "'step-transaction' doctrine collapses

'formally distinct steps in an integrated transaction' in order to assess federal tax liability on the

basis of a 'realistic view of the entire transaction.' *Id.* at 671 (citations omitted).

Here, plaintiffs argue, there are no steps in "an integrated transaction." Rather, this case

involves an independent transaction (payment of estimated income taxes) followed a few months

later by another independent transaction (crediting the gift tax accounts) that was not

contemplated at the time of the first transaction. This case is clearly different than *Brown*,

plaintiffs contend, where the court reasoned:

> Where a party acts as a "mere conduit" of funds--a fleeting stop in a predetermined voyage toward a particular result--we have readily ignored the role of the intermediary in order appropriately to characterize the transaction.
>
> Viewing the historical facts in the light most favorable to the Estate, it is nonetheless clear that Betty was a "mere conduit" of Willet's funds. The Browns do not advance any argument that the payment to Betty had any purpose or effect other than as a step towards facilitating Willet's payment of the gift tax liability and Betty owned Willet's funds for exactly one day. Betty's fleeting ownership can therefore be disregarded under the principles of *Robino* and *Stewart*.
>
> True, Betty was under no binding commitment to complete the prearranged plan. "Despite intimations to the contrary in the early cases," however, "there is ample authority for linking several prearranged or contemplated steps, even in the absence of a contractual obligation or financial compulsion to follow through." Where the two parties to the transaction were sufficiently related or commonly controlled, we have twice applied the step transaction analysis without any finding that the intermediary was legally bound to complete the prearranged plan. *See Robino*, 894 F.2d at 345 (transactions between two taxpayers and trust controlled by taxpayers and spouse of one taxpayer); *Stewart*, 714 F.2d at 984 (transaction between taxpayer and corporation he controlled).
>
> . . .
>
> . . . Willet's admitted intention in giving the funds to Betty was to enable her to make the gift tax payments. Finally, Betty was unlikely to flout the desires of her husband because it was she, as the initial beneficiary of the Estate, who stood to gain if the gift tax wager was successful. The two transactions culminating in gift tax payments should therefore be treated as one integrated whole despite the lack of a legally binding commitment.

*Id.* at 672-73 (some citations omitted). Here, there was no "conduit" or "intermediary."

Plaintiffs concede that the source of the funds can be pertinent but disputes that this inquiry was

the principal basis for the court's opinion in *Brown*.

Plaintiffs also contend that another inquiry - what taxes were due on two relevant dates,

December 29, 1987 and April 8, 1988 - undermines the Government's position. Plaintiffs note

that payments were made on Mr. and Mrs. O'Neal's 1987 estimated taxes throughout 1987. The

last payment, the one at issue here, was made on December 29, 1987. At this time, plaintiffs argue, Mr. and Mrs. O'Neal had <u>separate</u> income tax liability because they had not yet filed their joint return. *See* 26 U.S.C. § 6013(d)(3). On April 8, 1988, the IRS credited the amounts as noted above. However, at this point, Mr. and Mrs. O'Neal still had not yet filed a joint tax return for the year 1987; thus, the O'Neals continued to have separate liabilities for their 1987 taxes. Also, they had not yet filed their gift tax returns, so they had not yet elected to split their gifts under § 2513(d). Thus, at the time of the credit, their gift tax liabilities were also separate and distinct. *See* Pl. Response at 34-35.

Plaintiffs also note that § 6402(a), which the Government cites, states that the IRS can credit an account because of an overpayment "on the part of the person who made the overpayment." Thus, plaintiffs contend, the IRS had no authority to credit Mrs. O'Neal's gift tax account unless she was in fact the person who had "made the overpayment." *See DeLaune v. United States*, 143 F.3d 995, 1006 (5th Cir. 1998)("Under I.R.C. § 6402(a), a refund may only be obtained by the taxpayer who made the overpayment."). When the Government cited § 6401(a), plaintiffs note, it omitted the first four words of the statute: "The term 'overpayment' includes . . . ." Thus, the definition of "overpayment" is not limited to the words that follow. As noted by the Supreme Court in *Jones v. Liberty Glass Co.*, 332 U.S. 524 (1948):

> [W]e read the word "overpayment" in its usual sense, as meaning any payment in excess of that which is properly due. Such an excess payment may be traced to an error in mathematics or in judgment or in interpretation of facts or law. And the error may be committed by the taxpayer or by the revenue agents. Whatever the reason, the payment of more than is rightfully due is what characterizes an overpayment.

*Id.* at 531.

Plaintiffs further note that the Government left out pertinent words from § 6513(b)(2),

40

which the Government also cited in support of its position.  While § 6513(b)(2) does purport to

define what is a "payment," plaintiffs note that the first words of the statute are "For purposes of

section 6511 or 6512."  According to plaintiffs, §§ 6511 and 6512 deal with statutes of

limitations only.  Thus, § 6513(b)(2) merely defines the date that certain statutes of limitations

commence, nothing more.  *See* Pl. Response at 38.  Plaintiffs next contend that the cases cited by

the Government with respect to the rights of spouses to refunds of taxes pursuant to joint income

tax returns are irrelevant because, as noted above, at the time the events in question took place

Mr. and Mrs. O'Neal had not yet filed a joint tax return.

Finally, plaintiffs cite 26 C.F.R. § 1.6015(b)-1(b), which provides:

(b) Application to separate returns.

The fact that a joint declaration of estimated tax is made by them will not preclude
a husband and his wife from filing separate returns.  In case a joint declaration is
made but a joint return is not made for the same taxable year, the payments made on
account of the estimated tax for such year may be treated as payments on account of
the tax liability of either the husband or wife for the taxable year or may be divided
between them in such manner as they may agree.  In the event the husband and wife
fail to agree to a division, such payments shall be allocated between them in
accordance with the following rule.  <u>The portion of such payments to be allocated to
a spouse shall be that portion of the aggregate of all such payments as the amount of
tax imposed by chapter 1 (other than by section 56) shown on the separate return of
the taxpayer (plus, for taxable years beginning after December 31, 1966, the amount
of tax imposed by chapter 2 shown on the return of the taxpayer) bears to the sum of
the taxes imposed by chapter 1 (other than by section 56) shown on the separate
returns of the taxpayer and his spouse (plus, for taxable years beginning after
December 31, 1966, the sum of the taxes imposed by chapter 2 shown on the returns
of the taxpayer and his spouse).</u>

(Emphasis added).  Under this regulation, plaintiffs argue, Mrs. O'Neal's separate income tax

liability was $701,590.43.  *See* Pl. Response at 40; Schedule B.  The $700,000 applied to Mrs.

O'Neal's gift tax liability should not be included in Mr. O'Neal's gross estate.

C.  Defendant's Response

41

The Government counters that a proper reading of *Brown* shows that the court utilized the "step-transaction doctrine" for the sole purpose of determining the substance of the transaction, i.e., who actually paid the gift taxes at issue in the case. Here, the facts are unrefuted that Mr. O'Neal paid the $700,000 from his separate checking account. *See* Def. Reply. at 16-17. The Government also contends that the Technical Advice Memorandums cited by plaintiffs actually support its position. For example, Memorandum 8515001 specifically stated that the result reached would not "extend to situations where a donor transfers his own funds into a joint account prior to the payment of gift taxes, for the sole purpose of reducing his estate." Here, there is not even the pretense of a joint account. Mr. O'Neal paid the gift tax from a check drawn on his account. *See* Def. Third Response at 4-6; Attached Exhibits A-B (copies of Technical Advice Memoranda).

The Government also criticizes plaintiffs' "separate returns" arguments. The problem with the argument, the Government contends, is that the filing of separate returns never in fact happened. Mr. and Mrs. O'Neal not only filed joint federal and state returns in 1987, but past returns show that they consistently filed joint returns. *See, e.g.,* Def. Exs. 37, 40-42, 50-53. The Government also again argues that the $1,437,000 was not an overpayment but rather a deposit; thus, the IRS was required to follow the taxpayer's instructions and transfer the funds. *See* Def. Reply at 17-18. The Government also again disputes that the 1987 gift tax liabilities of Mr. and Mrs. O'Neal were separate liabilities. *Id.* at 18-19. The $700,000 should be included in Mr. O'Neal's gross estate.

D. Plaintiffs' Response

In the context of the litigation of Mrs. O'Neal's estate, plaintiffs note, the Government

42

stipulated, and both the district and Eleventh Circuit stated, that Mrs. O'Neal paid her own gift

taxes. *See* Def. Exs. 163, 196; *Estate of Elizabeth P. O'Neal v. United States*, 81 F. Supp. 2d

1205, 1209 (N.D. Ala. 1999); *Estate of Elizabeth P. O'Neal v. United States*, 258 F.3d 1265,

1267 (11th Cir. 2001). *See also* Pl. Third Reply at 2. Plaintiffs then again argue that the

Government has misinterpreted the Technical Advice Memoranda and *Brown*. *See* Pl. Third

Reply at 2-6.

## V. Reduction in Deduction for 1988 Alabama Income Tax Liability (Defendant's Issue 4).

### A. Defendant's Position

The Government concedes that Mr. O'Neal's estate is entitled to claim a deduction for

his share of the 1988 Alabama state income tax liability. *See* 26 U.S.C. § 2053(a)(3). On the

original estate tax return, the estate claimed a deduction of $93,797. During the IRS examination

and after receiving an Alabama tax refund for 1988, plaintiffs claimed that the deduction should

be reduced to $79,260. The IRS concluded, however, that the deduction should be reduced to

$38,054. Thus, the IRS increased Mr. O'Neal's taxable estate by $55,743.

The Government contends that the difference in the two numbers involves the parties'

allocation of the 1988 Alabama income tax liability between Mr. and Mrs. O'Neal. In essence,

the calculation depends on whether the $700,000 gift tax payment discussed above is allocated to

Mr. or Mrs. O'Neal. *See* Def. Br. at 51-52. Under Alabama law, the Government notes, a

deduction is allowed for any federal income, estate, or gift taxes paid or accrued within the

taxable year. *See* Ala. Code § 40-18-15(a)(3). The Government also contends that the deduction

is allowed only when the amount paid is for federal taxes imposed on the person paying it, and

the person is primarily liable for the tax. *See Sloss v. Alabama*, 89 So. 2d 174, 177 (Ala.

43

1956)("We think the claimed deduction is only allowable when the amount paid is for taxes imposed on the person paying it, who is the taxpayer on whom the tax as such is primarily laid by the United States."). Here, Mr. and Mrs. O'Neal made a gift splitting election in connection with their 1987 gifts. As a result, their gift tax liability was joint and several. *See, e.g.*, 26 U.S.C. § 2513(d); 26 C.F.R. §§ 25.2502-2, 25.2511(d).

Thus, the Government contends, Mr. O'Neal is entitled to claim a deduction for the gift tax payment because he paid the tax and is jointly and severally liable for the tax. When utilizing the deduction on Mr. O'Neal's return, his Alabama income tax liability equals $38,054. Therefore, the gross estate must be increased by $55,743 in order to properly reflect that the deduction. *See* Def. Br. at 53.

### B. Plaintiffs' Response

Plaintiffs apparently agree that this issue concerns how to properly allocate the $700,000 in gift taxes paid on behalf of Mrs. O'Neal. *See* Pl. Response at 40-42. For the reasons argued above, plaintiffs contend, the $700,000 should be allocated to Mrs. O'Neal, thus precluding the amount from having any affect on Mr. O'Neal's estate. Plaintiffs also argue that Alabama Code Section 40-18-13(a)(3) does not have a tracing or original source of funds rule. The deduction is for gift taxes imposed, and the $700,000 was imposed on Mrs. O'Neal. Thus, for Alabama income tax purposes, the $700,000 must be allocated to Mrs. O'Neal, regardless of who made the payment. *See* Pl. Response at 43.[21]

---

[21]The Government's reply brief makes essentially the same arguments as its initial brief on this issue. *See* Def. Reply at 19-20.

## VI. Deduction for Unpaid Gift Taxes (Plaintiffs' Second Motion)[22]

### A. Plaintiffs' Position

As noted above, plaintiffs offer two experts who opine that, as the date of his death, Mr. O'Neal still owed roughly $5 million in unpaid gift taxes, penalties, and interest. Plaintiffs claim that Mr. O'Neal's estate should be able to deduct the value of these claims. Plaintiffs also note that the opinions of Larry J. White, the Government's expert in this case, support their expert opinions.[23] According to plaintiffs, White acknowledged that there was a very high, almost certain probability that the IRS would have examined Mr. O'Neal's gift tax return. *See* Pl. Ex. 164 at 19. White also apparently agreed that Mr. O'Neal faced a substantial possibility that the IRS would impose additional gift taxes on the gifts to the donees and that these taxes would be deductible from his estate. *Id.* at 2-3. *See also* Pl. Second Br. at 11-13.

Turning to their argument, plaintiffs note that the donor is obligated to pay any gift taxes. *See* 26 U.S.C. § 2502(c). Pertinent Treasury regulations state: "The donor shall pay the tax. If the donor dies before the tax is paid the amount of the tax is a debt due the United States from the decedent's estate and his executor or administrator is responsible for its payment out of the estate." 26 C.F.R. § 25.2502-2. Plaintiffs also note that 26 U.S.C. § 2053(a)(3) provides that claims against a decedent's estate are deductible from the value of the gross estate. *See also* 26 C.F.R. § 20.2053-6(d) ("Unpaid gift taxes on gifts made by a decedent before his death are deductible."). Plaintiffs again note that in the context of Mrs. O'Neal's estate litigation, the

---

[22]The court notes that the arguments for this issue and the issue of whether the estate is entitled to a deduction for the donees' claims overlap somewhat.

[23]As noted above, plaintiffs have filed a motion to disqualify White, *see* Doc. 68, and do not concede that he is a proper expert witness.

Eleventh Circuit adopted the "snapshot" rule. *See Estate of Elizabeth P. O'Neal*, 258 F.3d at

1272, 1275-76. Here, plaintiffs argue, while the value of the stock under the buy-sell agreement

may have been proper for estate tax purposes, the IRS has held that it would be improper to use

such values for gift tax purposes. *See* Pl. Second Br. at 15.

Here, plaintiffs note, they have offered two expert witnesses who have each opined that

the estate of Mr. O'Neal still owes roughly $5 million in unpaid taxes, penalties, and interest.

Furthermore, as noted above, the Government's expert agrees with plaintiffs' experts on several

key points. Plaintiffs point out that in the case of Mrs. O'Neal's estate, the Government also

chose not to provide a witness who could help the court determine the value of the stock:

> The issue on remand is the value of the deduction as of July 23, 1994, the date of
> Mrs. O'Neal's death. In support of its contentions as to value, Mrs. O'Neal's Estate
> established the status of the transferee tax liability proceedings as of the
> date-of-death through the testimony of Mr. Augthry and the introduction of
> documents from those proceedings. Mrs. O'Neal's Estate then offered the testimony
> and reports of two experts who testified as to the value of the children's and
> grandchildren's claims as of Mrs. O'Neal's death.
>
> The government chose not to offer an expert to assist the Court. Instead, the
> government sought to establish a timeline of events by cross-examining Mr. Aughtry
> and the taxpayer's experts, and offering the testimony of Mr. Breen, Mrs. O'Neal's
> accountant, the IRS estate tax attorney who conducted the tax audit, and an IRS
> employee who participated in the engagement of Mr. Kaye. However, the
> government offered no evidence which would transform the timeline of events into
> admissible evidence of value, which is the question that the Court of Appeals placed
> before this Court. What this Court needed from the government, and did not receive,
> was evidence to assist this Court in determining the value of the claims as of Mrs.
> O'Neal's date of death.

*Estate of Elizabeth P. O'Neal*, 228 F. Supp. 2d 1290, 1291 (N.D. Ala. 2002)(footnote omitted).

Here, plaintiffs contend, the Government has put the court in the same position.

### B. Defendant's Response

The Government counters that any deduction, if one is even allowed, must be valued

based on the rules established by the Eleventh Circuit in *Estate of Elizabeth P. O'Neal*, 258 F.3d

1265 (2001). Using these rules, the Government argues, as with the deduction for the donees'

claims, any deduction here would be valued at zero because the alleged claim is not susceptible

to valuation since any undervaluation of the stock was "contingent and too speculative" at the

time of Mr. O'Neal's death. *See Estate of Armstrong v. United States*, 277 F.3d 490 (4th Cir.

2002).

Again, the Government notes that Mr. O'Neal died on August 7, 1988. At the time of his

death, the following events had occurred: Mr. O'Neal made gifts of O'Neal Steel stock in

November, 1987. On or before April 15, 1988, Mr. O'Neal filed a gift tax return for the year

1987. In that return, Mr. O'Neal valued the Class A and Class B stock as $54 and $61,

respectively. No appraisals of the O'Neal stock had been performed as of the date of the gifts.

Mr. O'Neal never made any effort to amend his 1987 gift tax return. As of the date of his death,

the IRS had not selected his gift tax return for review. None of the donees had made any

assertions of any claims against Mr. O'Neal seeking reimbursement of any gift tax that might be

payable by them. In sum, the alleged claim for unpaid gift tax is susceptible of valuation since

Mr. O'Neal was not subject to any definite liability at the time of his death.

Even assuming that the claim for unpaid gift tax liability could be valued under the

*Hagmann* exceptions, the Government argues, the court would be allowed to then look at post-

death facts. *See O'Neal*, 258 F.3d at 1272 n.24. Here, the post-death facts show that the IRS

never filed, asserted, proposed, or assessed any claim against Mr. O'Neal or his estate for the

1987 gift taxes. *See, e.g.,* Pl. Ex. 5 at 2-3. Further, the statute of limitations for any such

assessment has passed. *Id.* Here, as in *Hagmann*, a deduction is not allowable because any

potential liability is now unenforceable and has not been and will not be paid by the estate. *See also* Def. First Response at Exhibits A-B.

Alternatively, even assuming that these claims were susceptible to valuation, the Government argues, as with the donees' claims, any claim for unpaid gift taxes would still be zero because any such claim must be offset by a corresponding increase in Mr. O'Neal's gross estate under § 2035(b). *See* Def. Second Response at 8-9.

The Government also objects to the "selective" quotations from White's expert report cited by plaintiffs. For example, White concluded that any claim must be offset by a corresponding increase in Mr. O'Neal's gross estate under § 2035(b). *See* Def. Ex. 26 at 1 n.1, 20-22 n.5-7. *See also* Def. Reply at 5. In addition, White was not aware of any of the post-death facts that would be applicable if the *Hagmann* exceptions apply. White also stated in his deposition that "I have not re-read the report [of Frazier and Bullock] in preparation for today, so I really can't call to mind anything about his report with which I agree or disagree . . . ." *See* Pl. Ex. 165 at 116-17, 120.

### C. Plaintiffs' Reply

Plaintiffs begin by again focusing on White. They note that White did in fact state that there was a high probability that Mr. O'Neal's gift tax return would be selected for review. *See* Pl. Second Reply at 2-3. Plaintiffs also dispute the Government's interpretation of White's statements with respect to the offset under § 2035(b). Plaintiffs contend that what White actually said was that while it was "probable" that 2035(b) would apply, the issue "had not been decided by the courts or by the Internal Revenue Service in any published revenue ruling or by the Treasury in regulations. . . . Therefore, uncertainty persisted . . . ." *See* Pl. Ex. 164 at 21.

48

Speculation is not a conclusion. Plaintiffs also contend that White did have knowledge of the post-death facts. *See* Pl. Second reply at 4-5.

Next, plaintiffs contend that by focusing solely on the value of the deduction, the Government has in essence conceded that a deduction is allowable for the unpaid gift taxes. *See* Pl. Second Reply at 5-6. Thus, summary judgment should be granted on that issue. Plaintiffs also dispute whether the *Hagmann* exceptions, even if they exist, would apply to this case (and thus allow the court to look at post-death facts). Here, there is clearly a claimant – the IRS. All three experts agreed that there was a very high probability that the IRS would select Mr. O'Neal's gift tax return for examination.

As to whether the claim was "cognizable," plaintiffs cite Black's Law Dictionary, which defines "cognizable" as "(1) capable of being known or recognized; (2) capable of being judicially tried or examined before a designated tribunal. . . ." All three experts recognized the IRS' claim for unpaid taxes, penalties, and interest. Plaintiffs agree that the court in *Sys. Dynamics Int'l, Inc. v. Boykin*, 683 So. 2d 419 421 (Ala. 1996), cited by the Government, made a distinction between tax claims actually asserted and potential claims. However, plaintiffs note, that case dealt with a statute if limitations issue, and the court specifically stated that "[t]he period allowed by the statute of limitations is to run from the date of the accrual of a cause of action, not from the date of the occurrence of the act that provides the basis for the cause of action." *Id.* at 421.[24]

Plaintiffs cite *Estate of McMorris v. Commissioner*, 243 F.3d 1254 (10th Cir. 2001), as

---

[24]Plaintiffs contend that the district court in Mrs. O'Neal's case expressed concern that the IRS was trying to deny this type of claim when it clearly had a responsibility to determine the applicable gift taxes during the limitations period. *See* Pl. Second Reply at 9.

supporting their position.  Plaintiffs detail the facts of the case:

The facts are undisputed. Donn McMorris, Evelyn's husband, died in 1990, and Evelyn received 13.409091 shares of stock in NW Transport Service, Inc., from his estate.  The stock was reported in Donn's estate tax return at an appraised value of $1,726,562.50 per share as of the date of his death and that value became Evelyn's basis in the stock.  Evelyn, through her conservator Jerry McMorris, entered into an agreement with NW Transport to redeem the stock for $29,500,000.00 (approximately $2,200,000.00 per share), payable over 120 months at ten percent interest.

Evelyn died in 1991, a resident of Colorado.  In her federal estate tax return, her estate claimed deductions of $3,960,525.00 and $641,222.00, respectively, for her 1991 federal and state income tax liabilities.  Federal income tax in the amount of $3,681,703.00 and Colorado income tax in the amount of $639,826.00 actually were paid with Evelyn's 1991 individual tax returns.  A large part of the income reported on Evelyn's income tax returns resulted from the gain on redemption of the NW Transport stock.

In January 1994, the Commissioner issued a deficiency notice to Donn's estate disputing, among other things, the value of the NW Transport stock. Specifically, the Commissioner valued the stock at $3,618,040.00 per share. Donn's estate contested the Commissioner's determinations and, after lengthy negotiations, the parties reached a settlement in January 1996 for an increased value of the NW Transport stock at $2,500,000.00 per share as of Donn's death.  This value became the new basis for the NW Transport stock redeemed by Evelyn.  As a result of her increased basis, the taxable gain from Evelyn's redemption of the stock was eliminated and she realized a loss.

Evelyn's estate filed an amended 1991 federal individual income tax return seeking a refund of $3,332,443.00.  The amended return reflected a loss from redemption of the NW Transport stock and eliminated certain dividend income reported on the original return.  Meanwhile, Evelyn's estate was challenging a deficiency notice received in November 1994 concerning an unrelated gift deduction in the amount of $140,000.00 in her estate tax return.  The estate contested the deficiency in tax court and that litigation was ongoing when Evelyn's amended 1991 federal income tax return was filed in January 1996.

In March 1996, the Commissioner filed an amended answer in Evelyn's estate tax litigation, asserting an increased deficiency in estate taxes.  According to the Commissioner, the estate was no longer entitled to deduct Evelyn's 1991 federal and state individual income taxes because those liabilities were subject to refunds. Indeed, the Commissioner approved a $3,330,778.00 refund of Evelyn's 1991 federal income taxes in 1997, but the record filed with this court does not indicate that her

estate filed an amended 1991 state income tax return or a protective refund claim with the Colorado Department of Revenue.

Evelyn's estate later conceded the Commissioner's original deficiency determination in its entirety (including disallowance of the $140,000.00 gift deduction). However, the estate refused to accept the Commissioner's view that the estate's deduction for Evelyn's income tax liabilities should be limited to the amount ultimately found to be due and owing by Evelyn. The estate instead took the position that post-death events may not be considered in determining the amount of its deduction for Evelyn's individual income tax liabilities because those liabilities were valid and enforceable claims against the estate at the time of Evelyn's death. Unable to resolve their differences, the parties submitted the case to the tax court on a fully stipulated basis.

The tax court held that the estate's deduction for Evelyn's 1991 federal income tax liability must be reduced by the amount actually refunded in 1997. According to the tax court, it was proper for the Commissioner to consider events occurring after Evelyn's death in calculating this deduction because the estate challenged Evelyn's individual income tax liability through her amended return. The tax court also held that the estate's deduction for Evelyn's 1991 Colorado income tax liability should be reduced to reflect the proper amount of tax after being adjusted downward as a result of her decreased federal taxable income. Although the record revealed that Evelyn's estate had not filed an amended Colorado income tax return and Evelyn had not received a refund of any 1991 state income taxes, the tax court reasoned that nothing prevented the estate from seeking such a refund on Evelyn's behalf. The tax court determined there was an estate tax deficiency of $1,581,593.00 based on the amounts set forth in (1) the original notice of deficiency, and (2) the increased deficiency arising from disallowance of the estate deductions for Evelyn's 1991 individual income tax liabilities. The estate appeals the latter deficiency determination.

*Id.* at 1256-57 (footnotes omitted).

The Tenth Circuit reversed "the tax court's ruling that events occurring after death may be considered in valuing a claim against the estate deduction." *Id.* at 1263. In denying a motion to rehear the case, the court further stated:

Although the Fifth Circuit remanded with directions to recalculate a section 2053(a)(3) deduction as of the date of death in *Estate of Smith v. Commissioner*, 198 F.3d 515, 526 (5th Cir. 1999), we decline to impose such a requirement here because "the increased deficiency at issue in this appeal was not premised on a date-of-death miscalculation." *Estate of McMorris*, 243 F.3d at 1263. Instead, it "was based

51

> solely on the fact that the federal and state income taxes incurred by Evelyn in 1991 became subject to a refund as a result of a settlement between another estate and the Commissioner in 1996." *Id.* Having failed to persuade us on appeal that it was proper to base the disallowance of the estate's deduction on this post mortem event, the Commissioner may not now shift his position and argue for the first time on rehearing that the disallowance is supportable by facts that were in existence prior to Evelyn's death.

*See* Pl. Ex. 194 at 2-3 (copy of unpublished opinion).

Next, plaintiffs argue, the Government's argument that the claim is not susceptible to valuation lacks merit. Plaintiffs assert that White, the Government's expert, stated that he was not asked to express an opinion on this issue. *See* Pl. Ex. 164 at 1 n.1.[25] Plaintiffs cite *Estate of Smith v. Commissioner*, 198 F.3d 515 (5th Cir. 1999), in which the court stated:

> The actual value of Exxon's claim prior to either settlement or entry of a judgment is inherently imprecise, yet "even a disputed claim may have a value, to which lawyers who settle cases every day may well testify, fully as measurable as the possible future amounts that may eventually accrue on an uncontested claim."
>
> In fact, when addressing situations that are the obverse of the one in the instant case, i.e., when the decedent-estate taxpayer is a plaintiff rather than a defendant in a pending lawsuit, the Commissioner has considered himself capable of determining the value of a pending lawsuit in exact dollars and cents, even when the claim has not been reduced to judgment. Furthermore, courts have consistently held that "inexactitude is often a byproduct in estimating claims or assets without an established market and provides no excuse for failing to value the claims . . . in the light of the vicissitudes attending their recovery."

*Id.* at 525-26 (footnotes and citations omitted). Plaintiffs contend that this discussion is consistent with the snapshot principle adopted by the Eleventh Circuit. In fact, plaintiffs argue, the Eleventh Circuit, in dealing with Mrs. O'Neal's estate, directed the district court to value the donees' claims, even though these were not necessarily easily "susceptible" to valuation. Also, as noted above in connection with deduction for the donees' claims, plaintiffs argue that

---

[25]As noted above, White did state that any gift tax deduction would be offset by an increase in the gross estate. *See* Def. Reply at 5.

*Armstrong*, cited by the Government, is inapplicable. *See* Pl. Second Reply at 15-16.

## CONCLUSIONS OF THE COURT[26]

### *O'Neal I*

The court starts with a consideration of the possible application of the holdings of *O'Neal v. United States*, 258 F.3d 1265 (11th Cir. 2001) (*O'Neal I*) to the facts of this case. It should first be noted that the primary holding of *O'Neal I* is that "the *value* of the deduction claimed by the estate for claims against the estate under Section 2053(a)(3) must be valued as of the date of the decedent's death. All events occurring after the decedent's death that alter the *value* must be disregarded." (Emphasis added; citations omitted). *Id.* at 1276.

The facts of *O'Neal I* are obviously distinguishable from those here for a number of reasons. First, the plaintiff(s) are not the same. Further, there are the following distinctions: (1) Mr. O'Neal died on August 7, 1988 after his gift tax return was filed on April 15, 1988. Mrs. O'Neal died on July 23, 1994 after her gift tax return was filed on April 15, 1988. (2) As of the date of Mrs. O'Neal's death, the statute of limitations for assessing and collecting any unpaid gift taxes from her estate had run. This was not true as to Mr. O'Neal's gift taxes and his estate. (3) As of Mrs. O'Neal's death, the IRS had begun an examination of Mrs. O'Neal's gift tax return and had proposed to assess transferee liability against her donees. This was not true as to Mr. O'Neal. (4) As of the date of Mrs. O'Neal's death, further appraisals of her stock had been made and her donees had begun to contest proposed transferee liability. This was not true as to Mr. O'Neal. (5) The donees early on asserted alleged "restitution" claims against the estate of Mrs. O'Neal. The claims against Mr. O'Neal's estate were not filed by donees until June 24,

---

[26]In addition to the multiple briefs, filings, and other submissions of the parties, the court has considered recorded responses to the court's questions and oral arguments on September 16, 2003.

1992, over forty-six months after Letters Testamentary were issued by the Probate Court with

regard to his estate.[27]

Notwithstanding the distinguishing factors, the court will quote those portions of *O'Neal I* which apparently have some general application to this case. It should be noted, however, that the issue of the "values" of the donees' claims, as such, is not presently before this court. An initial issue is whether any donee claim deductions, at all, are available to Mr. O'Neal's estate.

> The government did not begin an audit of either Mr. or Mrs. O'Neal's gift tax returns until July 1990, nine months prior to the expiration of the three-year statute of limitations for assessing gift tax liability against them personally. During the audit, the agent requested much information. Much was supplied, well in advance of the statutory deadline. At no point prior to the deadline did the government assert that either Mr. or Mrs. O'Neal had failed to pay the appropriate amount of gift tax owing with respect to the 1987 gifts. Neither did the government request an extension of time in order to assess any additional gift tax due. When the statute of limitations expired, the government was barred from collecting any additional gift tax from either Mr. O'Neal's estate or Mrs. O'Neal.

*Id.* at 1267 (footnote omitted).

. . . .

> In June 2000, the government moved for and was granted a voluntary dismissal of its notice of appeal on the issue that Mrs. O'Neal's estate was not entitled to the $563,314 deduction. By this action the government appears to have abandoned its earlier argument that the amount of the deduction should be zero.

*Id.* note 20 at 1271.[28]

. . . .

Decisions issued by the Fifth Circuit prior to October 1, 1981 are binding

---

[27]For whatever significance it may have, the court notes that the donees' claims against Mr. O'Neal's estate were not filed until slightly less that seven months after November 25, 1991, when the IRS confirmed that it was seeking an appraisal of the donees' stock. On or about November 26, 1991, the attorneys for Mr. O'Neal's estate, Ms. O'Neal and the donees wrote a letter to the IRS insisting that the stock had been properly valued on the 1988 gift tax returns.

[28]There has been no such abandonment here.

precedent in this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) *en banc*. In 1984, the Fifth Circuit, in *Estate of Hagmann v. Commissioner*, 60 T.C. 465, 1973 WL 2207 (1973); *aff'd per curiam*, 492 F.2d 796 (5th Cir. 1974), affirmed the judgment of the tax court. The tax court opinion departed from *Ithaca Trust* and considered post-death events when it held that the estate was not entitled to a Section 2053(a)(3) deduction for debts that were obligations at the date of death, but never asserted by the claimants. In the absence of assertion, the obligations became unenforceable. The tax court limited its holding to the peculiar "circumstances of this case" involving "[a] claim without a claimant," but wrote in such a fashion that its opinion might be considered broader. 60 T.C. at 467. After considering the matter, our predecessor court, by memorandum opinion, stated that "we affirm the judgment of the Tax Court." 492 F.2d at 796. Twenty-five years later, in *Estate of Smith v. Commissioner*, 198 F.3d 515, 525 (5th Cir. 1999), the Fifth Circuit distinguished *Estate of Hagmann* on the basis that it was limited to a factual situation evaluating a potential claim without an existing claimant, or an identifiable claimant without a cognizable claim. We agree with this distinction. *Id.* We would also not be bound by a different reading of *Estate of Hagmann* as our per curiam opinion did not adopt the opinion of the tax court, but merely affirmed the judgment *See DeShong v. Seaboard Coast Line R. Co.*, 737 F.2d 1520, 1523 (11th Cir. 1984).

*Id.* note 24 at 1272[29]

. . . .

On remand, the district court is instructed neither to admit nor consider evidence of post-death occurrences when determining the date of death value of the Section 2053(a)(3) deduction. *Id.* at 526. It will be incumbent on each party to supply the district court with relevant evidence of pre-death facts and occurrences supporting the date of death value of the deduction as advocated by that party. *Id.* The district court will then, by using informed judgment, reasonableness and common sense, weighing all relevant facts and evaluating their aggregate significance, determine a sound valuation. *See* Revenue Ruling, 1959-1 C.B. 237, Rev. Rul. 59-60 (1959).

*Id.* at 1275 (emphasis added)(footnote omitted).

. . . .

As to the central issue on appeal, we conclude that the value of the deduction claimed by the estate for claims against the estate under Section 2053(a)(3) must be

---

[29]The Eleventh Circuit generally relied upon *Ithaca Trust*, 279 U.S. 151 (1929), another valuation issue case. The Eleventh Circuit also considered *Estate of Smith v. Commissioner*, 198 F.3d 515 (5 th Cir. 1999) and *Estate of McMorris v. Commissioner*, 243 F.3d 1254 (10th Cir. 2001) – again, both valuation cases.

*valued* as of the date of the decedent's death.  All events occurring after the decedent's death that alter the value must be disregarded.  That part of the district court order considering post-death events in limiting the amount of the deduction is vacated.

*Id.* at 1276 (emphasis added).

Again, the primary holding of *O'Neal I* is the method prescribed for determining value. It does not address the issue of post-death events as to any issue other than valuation.  Unlike the position of the Government in this case, it did not dispute in *O'Neal I* that the estate there was entitled to *a* deduction with respect to donees' claims.  *Id.* at 1271.  The parties have not cited any cases, one way or the other, which discuss whether post-death events may be considered in determining whether a deduction of *any* amount may be claimed by an estate as opposed to a consideration of the value of a deduction which can be claimed.

There is an obvious distinction between a determination of the valuation of a deductible amount and the determination of whether *any* amount is deductible.  Before the question of valuation is determined, the court must first decide if there can be a deduction.  *See Estate of Hagmann, etc. v. Comm'r*, 60 T.C. 465 (1973), *aff'd*, 492 F.2d 396 (5th Cir. 1974).  While *O'Neal I* apparently makes it clear that the court should not consider post-death events in making valuations, it does not address the issue of whether post-death events may be otherwise considered with regard to deductibility.  *Compare Comm'r v. Shively's Estate*, 276 F.2d 372 (2d Cir. 1960).[30]

### Issues In This Case

The present legal issues, based upon apparently undisputed facts, which this court is to

---

[30] This court does not suggest that post-date-of-death events have been considered by this court, only that *O'Neal I* does not preclude all such considerations.

decide are the following:

(1) Is the $700,000.00 paid on Mrs. O'Neal's gift taxes from an estimated income taxes amount remitted by Mr. O'Neal from his separate bank account due to be added to Mr. O'Neal's estate?

(2) Is any amount deductible from Mr. O'Neal's estate for donees' claims against Mr. O'Neal's estate?

(3) Is Mr. O'Neal's estate due to be increased due to a reduction in his state income tax deduction for 1988?

(4) May Mr. O'Neal's estate presently deduct unpaid gift taxes, although not collectible, on additional gift taxes due based on his 1987 gifts?

The court will address each of these issues.

$700,000.00 Payment[31]

The parties agree that if Mr. O'Neal had directly paid from his separate funds the $700,000.00 on Mrs. O'Neal's gift taxes, the $700,000.00 would be due to be added to Mr. O'Neal's estate.  The only purported substantive argument that the plaintiffs make to oppose the Government's position is their citation to IRS Regulation § 6015(b)-1(b).  *See* Treas. Reg. § 1.6015(b)-1(b).  This court rejects that argument of the plaintiffs.

There is no dispute that Mr. O'Neal paid $1,437,000.00 from his separate funds on December 29, 1987 toward tax estimate(s) on behalf of Mr. O'Neal and Mrs. O'Neal.  After the

---

[31]This payment relates both to the issue of inclusion of the $700,000.00 in the estate of Mr. O'Neal and the issue of his correct state income tax liability.

tax estimate was paid,[32] the O'Neals determined that the estimate was overstated and requested

that the IRS apply $737,000.00 to Mr. O'Neal's gift taxes and $700,000.00 to Mrs. O'Neal's gift

taxes. This court concludes that this resulted, in substance, to a payment by Mr. O'Neal of

$700,000.00 of Mrs. O'Neal's gift taxes from his separate funds. This court further concludes

that said § 1.6015(b)-1(b) has no application to the payment. It is clear that the section pertains

to the allocation of payments to the separate <u>income tax returns</u> of spouses. It is not necessary

for the court to determine whether some amount would be due to be added to Mr. O'Neal's

estate if a proportionate amount of the estimate had been allocated to Mrs. O'Neal's separate

<u>income tax</u> liability. Here, it is clear that it was paid on her separate gift tax obligation and that

the original source was Mr. O'Neal's separate funds.[33] The court concludes that the $700,000.00

is due to be added to Mr. O'Neal's estate. The court's conclusion in this regard also determines

the issue of state income tax liability which this court declares in favor of the Government.

### Deduction of Donees' Claims

The Government makes several substantive arguments in opposition to the right of Mr.

O'Neal's estate to deduct any amounts for the claims of the donees. These arguments include:

(1) Any purported claims at the date of Mr. O'Neal's death were so vague, uncertain, and

speculative as to be non-deductible.[34] (2) The value of the claims as of the date of Mr. O'Neal's

---

[32]There may be an argument as to whether the amount was "paid," "deposited," or "remitted." For a discussion of what constitutes "payment" of taxes, *see* 15 Mertens Law of Fed. Income Taxes §§ 58-57 (Sept. 2003).

[33]The plaintiff conceded at oral argument that if Mr. O'Neal had paid the $700,000.00 directly to IRS as a gift tax payment, it would be due to be added.

[34]The court has not considered whether the additional gift taxes were "due" from Mr. O'Neal as of the date of his death. If not, plaintiffs' alleged deductions may be defeated by *O'Neal* I and *Ithaca*. This court assumes that there would be no claims against the donees until there was an additional gift tax claim against Mr. O'Neal which was due and not timely paid. *See Fletcher Trust Co. v. Comm'r*, 141 F.2d 36 (7 th Cir. 1944). This court, however, does not reach that issue.

death would be zero because of one of either of two facts: Using the same hypotheticals as proposed by the plaintiffs, (a) the estate's probate assets would be exhausted by primary federal gift tax claims having priority over all other claims, leaving no assets to pay donee claims, or (b) the additional gift tax asserted on Mr. O'Neal's gifts would be fully satisfied out of the estate's probate assets, so that no transferee liability would be imposed on the donees and, thus, they would have no deductible claims.[35] (3) The Government further argues, even assuming that the donees' claims have a value greater than zero, that any purported tax benefit to the estate would be zero because, under 26 U.S.C. § 2035(b), the amount of any such deduction would be offset by a corresponding increase in Mr. O'Neal's gross estate. That provision reads:

> The amount of the gross estate (determined without regard to this subsection) shall be increased by the amount of any tax paid under chapter 12 by the decedent or his estate on any gift made by the decedent or his spouse during the 3-year period ending on the date of the decedent's death.

The Government relies substantially on *Estate of Sachs v. Commissioner*, 88 T.C. 769 (1987), reversed in part on other grounds, 856 F.2d 1158 (8th Cir. 1988), with regard to this issue.

The court has previously summarized the parties' positions with regard to the donee liability deductions and will not totally repeat them here. The court will refer to some of those positions in reaching its own conclusions. The court will discuss the arguments in order.[36]

---

[35]As to alternative (a), the Government argues that it could have an excess claim against the donees for any amount not paid by the estate.

[36]The Government also makes an argument that the donees' claims are not deductible because they were not timely filed. This court does not reach that issue. While the court does not reach the issue of whether the donees' claims were timely filed, the court does note that the time for filing the claims in state court may well have been six months from the date Letters Testamentary were issued by the Probate Court. *See La. Fortune v. Comm'r*, 263 F.2d 186 (10th Cir. 1958) and *Mississippi Valley Trust Co. v. Comm'r*, 147 F.2d 186 (8th Cir. 1945). The court also notes that the claims were filed over six months after the Government raised the issue of the value of the donees' stock. *See* note 27, *supra*.

(1) This court does not reach the issue of whether the claims are so vague, uncertain and speculative as to not allow a deduction of donee claims. The court does note that the plaintiffs' reliance on *O'Neal I* is not likely appropriate since it related only to the date of valuation determination if a deduction is allowable. The allowance of the deduction was not an issue in *O'Neal I*.[37] Although this court does not reach the issue of whether the claims of the donees at the time of death were too speculative or uncertain to be deductible, it calls attention to the case of *Frank Armstrong, Jr. Trust ex rel. v. United States*, 132 F. Supp 2d 421 (W.D. Va. 2001), *aff'd*, 277 F.3d 490 (4th Cir. 2002). Further, while this court does not specifically decide the issue of whether the donees' claims are speculative and uncertain, it does note the following factors, some intermingled with issues which this court does decide, which could reasonably lead, on some later *de novo* review, to alternative reason(s) for granting summary judgment as to the donees' claims.

First, the hypotheticals of the plaintiffs' experts may be so speculative as to either be inadmissible or, at best, too uncertain to support donee claims deductions. Second, there is the uncertainty of whether any claims would have ever been made against the donees by the Government since the gift tax claims could have been made against the donor, the primary obligor, or his estate. Third, the timing of the donees' filing of their claims with the Probate Court may make them generally uncertain. Fourth, the above-referenced *Sachs*-type issue may render the donees' claims uncertain and speculative. Fifth, there are the uncertainties, if not absolute bars, raised by the attorneys for Mr. O'Neal's estate and/or the attorneys for the donees in their letter dated November 26, 1991. Sixth, Treasury Regulation § 20-2053-4 (1958)

---

[37]It is not clear at what point certain, non-speculative donee claims would arise; whether before death, at point of death or after death. This court has not reached that issue.

provides that claims are deductible only to the extent that they represent "personal obligations of the decedent existing at the time of his death." It may not be clear that the donees' claims against Mr. O'Neal existed at the time of his death. Finally, but perhaps not completely, the uncertainty of calculating the claims may make them uncertain.[38]

In a letter dated November 26, 1991, the attorneys for the plaintiffs and/or the donees stated, "The reasons why the donees are not liable for an additional gift tax on the 1987 gifts of O'Neal Steel, Inc. stock by Elizabeth O'Neal and Kirkman O'Neal are too numerous for us to fully cover in this letter." The attorneys then stated: "[T] he prior discussion of § 2504(c) reveals that there is no transferee liability on any donee ... ." The attorneys added that "[§ 2504(c)] clearly establishes that any taxes on these gifts must be determined based on the values of those gifts reported in the gift tax returns filed with the government. The gift taxes on these amounts were timely paid, therefore no deficiency or liability could exist." These statements at least suggest uncertainty as to whether there were certain, non-speculative donee claims at the time of Mr. O'Neal's death. Further, the continued disparities in appraisals suggest not only different valuations, but also uncertainties.

(2) The court agrees with the Government's second argument as addressed above. It should be considered axiomatic that if the Government, as asserted in the plaintiffs' hypotheticals, was likely to redetermine gift tax liability, it was also similarly likely to assert a primary claim against Mr. O'Neal's estate which would either exhaust the estate or cause the gift tax liability to be collected from the estate so as to eliminate donee liability.

The plaintiffs in a "now you see it, now you don't" argument assert that there was a 90-

---

[38]The Government also argues that the Probate Court's statement that the claims were premature makes them uncertain.

100% chance of an audit leading to a gift tax liability of Mr. O'Neal's estate of several million dollars. On the other hand, the plaintiffs would apparently have the court determine that the IRS would not have pursued the primary liability of Mr. O'Neal's estate, but would have relied solely on pursuing the donees. In an extension of this "now you see it, and now you don't" argument, the plaintiffs further suggest that, even now, Mr. O'Neal's estate should be reduced by the amount of the hypothetical gift tax claim which it acknowledges would not be collectible.[39] The court concludes that the amount of any alleged donee liability deduction would be zero. In so determining, the court is not determining value, just that there could be no value.[40]

(3) The court agrees with the logic and reasoning of *Sachs* and accepts the Government's 26 U.S.C. § 2035(b) argument as an alternative reason for disallowing the donee deductions. The plaintiffs argue that *Sachs* is not applicable here because it involved a "net gift." The Eighth Circuit in *Sachs* agreed with the Tax Court "that the donor of a net gift uses the donee as a conduit for the payment of his tax liability, and '[a]s donor of a net gift, he may be deemed to have paid the tax by ordering the donee to pay it over ....' 88 T.C. at 778." There is no apparent substantive difference in gift tax liability (except in amount) being directly imposed by the donor and the gift tax liability being imposed by law as the result of the donor's failure to pay the gift tax. Arguably, the latter situation would create even a more logical reason to apply *Sachs* since the donor has caused his primary liability to be imposed on the donee.

---

[39]The court rejects this argument, listed as issue (4) above.

[40]Plaintiffs seem to argue that claims may be deductible even though there is no property subject to claims in the estate. *See, however*, 26 U.S.C. § 2053(c)(2).

Summary

In *O'Neal I*, the court advised the trial court to use common sense.  In a somewhat different context, this court has attempted to use common sense, logic, and controlling law to the extent that it can be determined.  The court ultimately concludes that:  (1) The subject $700,000.00 paid on Mrs. O'Neal's gift tax is due to be added to Mr. O'Neal's gross estate; (2) The state income tax liability on Mr. O'Neal's estate tax return is due to be adjusted as argued by the Government; and (3) Mr. O'Neal's estate will not be allowed deductions for any of the asserted donee gift tax claims.[41]

Summary judgment will be granted accordingly.  Within fifteen (15) days the defendant will submit and serve a proposed (order) (judgment).  The plaintiffs will have ten (10) days to object as to form and/or inconsistency with this memorandum opinion.  Thereafter, the court will enter the (order) (judgment).[42]

This 8 of October, 2003.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[41]The court notes that the assumptions stated in plaintiffs' Statement of Deductions, etc. filed on September 19, 2003 have no basis in fact.

[42]The court has not specifically addressed some pending filings and motions.  The court does not deem them pertinent to its conclusion.  The parties may suggest, at the time of their submissions with regard to the proposed (order)(judgment) any specific additional issues which they feel should be addressed by the court.  The court is not suggesting, at this stage, further argument.